**PROVIDENT SECURITIES COMPANY, a California corporation, Plaintiff,**

v.

**FOREMOST-McKESSON, INC., a Maryland corporation, Defendant.**

**No. C-70 460.**

United States District Court,
N. D. California.

Sept. 15, 1971.

John B. Bates, William S. Mailliard, Jr., Pillsbury, Madison & Sutro, San Francisco, Cal., for plaintiff.

Edward D. Landels, Philip E. Diamond, Michael L. Parker, Landels, Ripley & Diamond, San Francisco, Cal., for defendant.

SCHNACKE, District Judge.

This is an action for declaratory relief brought by Provident Securities Company, a dissolved California corporation, to determine its nonliability to Foremost-McKesson, Inc. for short-swing profits under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78p(b).

Foremost has filed a counterclaim seeking a declaration of such liability. The matter is before the Court on cross motions for summary judgment and partial

summary judgment [1] and would appear to be ripe for such disposition since there does not appear to be any dispute as to the facts.

Provident (now dissolved) was a "family" corporation incorporated under the laws of California in 1915 by the four children of W. H. Crocker for the purpose of managing various assets for the benefit of themselves and their heirs. Its shareholders were the descendants of these four children.

In late 1968, it was decided by those interested that different objectives among the heirs and tax considerations dictated that Provident should either be liquidated or sold and the assets or proceeds from the sale distributed pro rata to the shareholders.

One of the corporations interested in acquiring Provident or its assets was Foremost. After investigation of various other proposals, Provident favored a proposal made by Foremost whereby Foremost would purchase most of Provident's assets. Provident would then liquidate and dissolve by distributing to its shareholders its remaining assets and the consideration received from Foremost for its other assets.

Within these broad outlines, there were extensive negotiations between Provident and Foremost regarding the form of the transaction and the nature of the consideration to be paid by the latter.

To facilitate liquidation and dissolution of the company, Provident was primarily interested in selling to Foremost for cash, but Foremost, for reasons of its own, wished to pay the major portion of the purchase price in securities of Foremost, namely, 6 per cent convertible subordinated debentures due June 15, 1994, to be issued expressly for this purpose. In response to this, Provident argued that if Foremost wanted to use debentures to finance the purchase of Provident's assets, it should sell its own debentures and pay Provident in cash, but this was not acceptable to Foremost.

In an attempt to accommodate Foremost, Provident next stated that it would agree to accept convertible debentures instead of cash provided Foremost agreed to use its best efforts to insure that Provident could sell all of the debentures received at a public offering as soon as possible after the closing of the purchase. Again, Foremost was not willing to accept Provident's suggestion and after extensive negotiations, compromise was reached whereby Foremost agreed to affect registration under the Securities Act of 1933 of up to one half of the debentures to be delivered as payment for Provident's assets and to enter into an underwriting agreement as promptly as possible following the closing of the purchase whereby up to one half of the debentures would be publicly sold by an underwriting group.

On September 25, 1969, a Purchase Agreement was executed by Foremost and Provident which provided that Foremost would purchase approximately two-thirds of Provident's assets for a purchase price of $54,000,000 (subject to certain adjustments) consisting of $4,-450,000 in cash and $49,750,000 aggregate principal amount of Foremost's 6 per cent convertible subordinated debentures due June 15, 1994, which were issued expressly for the purpose of acquiring Provident's assets.[2]

The agreement further provided that following the closing of the purchase agreement, Provident could distribute to its shareholders, as part of its plan of liquidation and dissolution, the Foremost debentures delivered pursuant to the Purchase Agreement but that these debentures would not be marketable without prior written consent of Foremost unless registered under the Securities Act of 1933. Both the debentures and

1. The Foremost motion would leave for future determination the amount of such liability.

2. All of the debentures issued were in fact used for that purpose.

any common stock issued on conversion were to be legended as follows:

"The transfer of this security is subject to the conditions specified in a Purchase Agreement dated September 25, 1969, between Foremost-McKesson, Inc. and Provident Securities Company and no transfer of this security shall be valid or effective until such conditions have been fulfilled."

The agreement also provided that Foremost would use its best efforts to cause a registration statement covering an aggregate principal amount of debentures up to $25,000,000, i. e. approximately one-half of the total to be issued, to be filed under the Securities Act of 1933 as soon as practicable after the date of the agreement (September 25, 1969) and agreed to enter into an underwriting agreement whereby the debentures so registered would be sold to the public. It was initially contemplated that all of the debentures delivered to Provident by Foremost in payment for Provident's assets would be distributed in kind to Provident's shareholders and that Provident's shareholders would then be named as the selling debenture holders in the above-mentioned underwriting agreement.

The Purchase Agreement was set to close on October 15, 1969, and contained numerous conditions which had to be satisfied before either party would be bound to close, among which was a condition that the holders of at least one-half of the outstanding common stock of Provident approve and adopt a proposal that Provident be wound up and dissolved and adopt a plan of complete liquidation of Provident and that the holders of at least one-half of the outstanding common stock and the holders of at least two-thirds of the outstanding preferred stock of Provident approve and ratify the execution of the Purchase Agreement.

As early as September 3, 1969, the Board of Directors of Provident resolved to recommend to the shareholders dissolution and winding up of the corporation and adoption of a plan of complete liquidation and distribution of the corporate assets to the shareholders.

Simultaneously with negotiations for this agreement Provident's Board of Directors and shareholders began procedures necessary for winding up and dissolving the corporation.

On September 29, 1969, Provident filed a certificate of election to wind up and dissolve with the California Secretary of State and mailed notice of intention to wind up and dissolve to all of its creditors and shareholders.

On the same date, Foremost filed a Form S-1 registration statement with the Securities and Exchange Commission pursuant to the Securities Act of 1933 covering the $25,000,000 aggregate principal amount of the Foremost debentures pursuant to which the Provident shareholders, as sellers, would offer the $25,000,000 aggregate principal amount of debentures distributed to them as a liquidating distribution by Provident. This S-1 form was amended on October 3, 1969.

Early in October of 1969, Provident realized that there were several difficulties in having the shareholders themselves make the public offering of the $25,000,000 aggregate principal amount of Foremost debentures following distribution of the same to them. Certain of the shareholders were minors and one of the shareholders could not be contacted. The problem was discussed with Foremost, and Foremost orally agreed to a change in the Purchase Agreement so that Provident itself, instead of its shareholders, might sell the $25,000,000 principal amount of debentures. This was really no more than a change in form since by the terms of the Purchase Agreement as originally drawn, Foremost was committed to enter into an underwriting agreement authorizing the immediate sale of $25,000,000 principal amount of Foremost debentures. At a meeting of the Provident shareholders on October 13, 1969, Provident obtained the consent of two-thirds of the pre-

ferred stockholders and a majority of the common stockholders to this change and on October 15, 1969, Foremost formally consented in writing to the alteration, and it was incorporated in amendment No. 2 to the S–1 registration form filed on October 21, 1969.

At the closing on October 15, 1969, Foremost delivered to Provident a check for $4,250,000 and a debenture in the principal amount of $40,000,000. Pursuant to the agreement, $2,500,000 principal amount of debentures were delivered to Bank of American National Savings and Trust Association as an escrowholder. The remaining $7,250,000 principal amount of debentures due under the agreement were delivered on October 20, 1969.

. After receipt of the debenture in the principal amount of $40,000,000, Provident had it split into two parts, one of $15,000,000 and the other of $25,000,000. Upon receipt of the final $7,250,000 principal amount of debentures on October 20, Provident executed bond powers to effect transfer of the $7,250,000 and the $15,000,000 aggregate principal amount of debentures pro rata to its shareholders pursuant to a liquidating resolution of the Board previously adopted on October 13, 1969. Instructions to make this distribution were mailed to First National City Bank as trustee under the indenture covering the debentures on October 21, 1969, and the actual mailing of the debentures took place on October 24, 1969. After this distribution, there remained in Provident's possession $25,000,000 aggregate principal amount of debentures. On October 21, 1969, the registration statement under the Securities Act of 1933 covering the $25,000,000 aggregate principal amount of debentures became effective and in accordance with the Purchase Agreement of September 25, 1969, an underwriting agreement · between Foremost, Provident and Dillon, Read & Co., Inc., as representative of the underwriting group, covering the $25,000,000 of debentures was executed by all parties. This underwriting agreement closed on October 28, 1969. At the closing, the underwriters delivered $25,-366,666.66 to Provident through New York clearing house funds, and Provident delivered the debenture in the principal amount of $25,000,000 to the underwriters. Shortly thereafter Provident distributed cash to its shareholders in the amount of $29,623,500 (including the funds received from the underwriters).

Throughout October of 1969, there were other liquidating dividends paid to Provident's shareholders consisting both of cash and of various securities as the process of liquidation and winding up proceeded.

Section 16(b) provides:

"For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transac-

tion where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection."

Foremost contends for a starkly literal reading of Section 16(b), which would make Provident, by virtue of its short-lived position as holder of the convertible debentures of Foremost, accountable to it as provided in 16(b) for the relatively small profit resulting from the underwriting described above, without regard to the overall character of the transaction and its ultimate effect. It makes no claim that any of the evils against which 16(b) were directed were present in this, or that Provident derived inside information, profit or advantage from its all-but-momentary status as an "insider" of Foremost.

To require Provident to pay over to Foremost the amount the latter seeks under Section 16(b) would be to confer a complete windfall upon Foremost and would be utterly at war with any concept of equity known to this Court.

Fortunately, the Courts, mindful of Justice Holmes's oft-quoted canon of statutory construction, by which "[a word] is but the skin of a living thought", have not felt required to apply 16(b) in all cases regardless of concomitant equities and circumstances. In the leading case in this Circuit, Judge Browning, speaking for a unanimous Court, enjoins us that in construing Section 16(b):

"The initial inquiry must therefore be: What is the purpose of section 16(b)—what practices is the statute designed to prevent." Blau v. Max Factor & Company, 342 F.2d 304, 307 (9th Cir.), certiorari denied 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150.

Likewise, the Eighth Circuit has said:

"There is, however, a very different and difficult problem when a transac-

tion falls within the literal boundaries of the Act, by giving a broad interpretation of the definitions of purchase as 'any contract to buy, purchase or otherwise acquire,' and sale as 'any contract to sell or otherwise dispose of,' yet due to the particular factual situation which makes unfair speculation impossible it is clearly beyond the Act's preventive purposes. In that situation the question arises, should the Act be literally applied without further inquiry and without regard to the purposes, or should the broad and arbitrary rules be applied only to situations which are capable of the abuse that the statute was designed to prevent? We believe that each case must be examined on its own facts and the Act only applied when these facts disclose the possibility of abuses that the Act were designed to prevent." Petteys v. Butler, 367 F.2d 528, 533 (8th Cir.).

It is sometimes said that Section 16(b) sets forth merely a "crude rule of thumb", the inference being drawn that if the facts, without regard to the purposes of the statute, the surrounding circumstances and the equities inherent therein, are such as are described in that section, the courts have no alternative but to impose liability. However, as to this, the Second Circuit has said:

"The description, 'a crude rule of thumb,' was first employed by Mr. Thomas Corcoran, spokesman for the drafters of the statute, during congressional hearings on the bill which ultimately became section 16(b). Hearings Before Senate Committee on Banking & Currency, 73d Cong., 2d Sess. 6557 (1934). The phrase now serves to describe not only the statute but also one approach to its application. Under the 'objective' or 'rule of thumb' approach, the statute is applied to all transactions which seem to fall within its terms, without regard to whether imposition of liability would further the purposes of the statute. See, e. g., Heli-Coil Corp. v.

Webster, 352 F.2d 156 (3d Cir. 1965). We have rejected this interpretation, see Blau v. Lamb, 363 F.2d 507 (2d Cir. 1966), cert. denied, 385 U.S. 1002, 87 S.Ct. 707, 17 L.Ed.2d 542 (1967), in favor of the more 'pragmatic' approach of applying the statute only to those situations subject to speculative manipulation. For a comparative analysis of the two approaches to application of the statute, which concludes that this Circuit's rule is preferable, see Note, Stock Exchanges Pursuant to Corporate Consolidation: A section 16(b) 'Purchase or Sale'?, 117 U.Pa.L.Rev. 1035 (1969)." Newmark v. RKO General, Inc., 425 F.2d 348, 350, n.2.

"The threshold issue raised on this appeal is whether the purchase and subsequent exchange of Central shares lent itself to the type of speculative abuse which section 16(b) was designed to prevent. Blau v. Lehman, 286 F.2d 786 (2d Cir. 1960) aff'd, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962); Park & Tilford, Inc. v. Schulte, 160 F.2d 984 (2d Cir.), cert. denied, 332 U.S. 761, 68 S.Ct. 64, 92 L.Ed. 347 (1947)" (emphasis added). *Id.*, at p. 353.

Even a cursory view of the facts presented herein are enough to show that to decide for Foremost would require application of an extremely crude rule of a most deformed and misshapen thumb. In all its essential details the form of the transaction was insisted upon if not dictated by Foremost, often contrary to the plans and wishes of Provident. If the matter had been handled as Provident wished, this case could never have arisen. To allow Foremost under these circumstances to recover the small profit of Provident (almost miniscule in terms of the total amounts involved) simply by a mindlessly literal application of Section 16(b) would be to perpetrate rather than correct an inequity. This the Court is unwilling to do.

Summary judgment will accordingly be rendered for Provident.