**PROVIDENT SECURITIES COMPANY, a California corporation, Plaintiff-Appellee,**

v.

**FOREMOST–McKESSON, INC., a Maryland corporation, Defendant-Appellant.**

No. 71–2965.

United States Court of Appeals, Ninth Circuit.

Sept. 19, 1974.

Certiorari Granted Feb. 18, 1975.
See 95 S.Ct. 1117.

---

Morton Moskin, New York City, N.Y., (argued) of Landels, Ripley & Diamond, San Francisco, Cal., for defendant-appellant.

Walter R. Allan (argued) of Pillsbury, Madison & Sutro, San Francisco, Cal., for plaintiff-appellee.

Before ELY, TRASK and WALLACE, Circuit Judges.

## OPINION

WALLACE, Circuit Judge:

Provident Securities Company (Provident) filed this action, seeking a declaration of nonliability for short-swing profits under section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). Foremost-McKesson, Inc. (Foremost) counterclaimed, seeking a declaration of liability and recovery of the profits. Both parties moved for summary judgment and the district court found in favor of Provident, holding that the Provident-Foremost transaction did not fall within section 16(b) since it did not involve the potential for speculative abuse of inside information condemned by the Act. Provident Securities Co. v. Foremost-McKesson, Inc., 331 F.Supp. 787 (N.D.Cal.1971). We affirm, but on other grounds.

Provident (now dissolved) was a holding company owned by the descendants of W. H. Crocker. In the fall of 1968, it tentatively decided to liquidate its assets and hired Dillon, Read & Company to analyze its financial structure and to seek a purchaser which in turn led to Provident negotiating with Foremost. Initially Provident hoped to sell its assets for cash since cash would be easy to distribute to its shareholders. But eventually it compromised and accepted convertible debentures, one half of which would be registered as soon as possible after closing so that the stock could be offered to the public.

On September 25, 1969, pursuant to this compromise, Provident and Foremost executed a purchase agreement which provided that Foremost would purchase approximately two-thirds of Provident's assets for $54,000,000, consisting of $4,250,000 in cash and $49,750,000 in Foremost six percent convertible subordinated debentures. On October 15, 1969, the closing was held under the purchase agreement. At that time Foremost delivered to Provident a check for $4,250,000 and a debenture in the principal amount of $40,000,000. This debenture was subsequently split into two debentures in the principal amounts of $25,000,000 and $15,000,000. At the time of closing and in Provident's behalf, Foremost also delivered to an escrow agent a debenture in the principal amount of $2,500,000. The debentures were immediately convertible into common stock in an amount in excess of 10 percent of Foremost's outstanding shares. At the completion of the sale, Provident became a beneficial owner of more than 10 percent of a class of Foremost equity securities as provided in section 16(a) of the Act, 15 U.S.C. § 78p(a). On October 20, 1969, Foremost delivered to Provident an additional debenture in the principal amount of $7,250,000.

The following day, October 21, 1969, Provident, Foremost and Dillon, Read & Company, as representative of the underwriting group (Underwriters), executed an underwriting agreement providing for the sale by Provident of the debenture in the principal amount of $25,000,000 to Underwriters at a price of $25,366,666.66. On October 24, 1969, Provident distributed debentures to its

shareholders in the aggregate principal amount of $22,250,000. At this point Provident ceased to be a 10-percent shareholder of Foremost stock.

On October 28, 1969, the closing under the underwriting agreement was held and Provident transferred the $25,000,000 debenture to Underwriters in exchange for a check in the amount of $25,366,666.66. The following day, after waiting the necessary time for the check to clear, Provident distributed the cash to its shareholders. On August 31, 1970, following the completion of liquidation proceedings, Provident was dissolved and its remaining assets transferred to a liquidating trust.

### A. The Threshold Test—Potential for Speculative Abuse

Section 16(b) of the Securities Exchange Act was enacted to prevent corporate officers, directors and principal shareholders from profiteering in inside information through short-swing speculation. The section was designed to discourage corporate insiders from reaping profits from fluctuations in the price of their corporation's stock that were predictable on the basis of inside information.[1]

Consistent with this statutory purpose, the Supreme Court in Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 595, 93 S.Ct. 1736, 36 L. Ed.2d 503 (1973), recently adopted a pragmatic approach that subjects short-swing transactions by an insider to section 16(b) scrutiny only if they involve the potential for speculative abuse of in-

side information. As a prerequisite to the *Kern County* threshold test, however, the Court indicated that there must be an "unorthodox" transaction such as "stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassification, and dealings in options, rights, and warrants." 411 U.S. at 593 n.24, 93 S.Ct. at 1744. The Court's examples of "unorthodox" transactions were probably not intended to be all inclusive but suggest that if the transaction is cash-for-stock or essentially cash-for-stock, then the *Kern-County* threshold rule should not be applied. In the orthodox case, the transaction must be tested against the literal terms of the section.

The Provident-Foremost transaction was essentially a cash-for-stock transaction. Provident purchased Foremost debentures, convertible immediately into a large block of common stock, in exchange for two-thirds of its assets. There was no substantial period of delay between the initial agreement and the exchange of consideration. The rights and obligations of the parties were fixed when the purchase agreement was executed. The purchase price did not depend on a formula that was tied to the price of the stock on the market, cf. Booth v. Varian Associates, 334 F.2d 1 (1st Cir. 1964), cert. denied, 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965), but was fixed at the time of agreement. The transaction was not merely a record-keeping maneuver, cf. Blau v. Max Factor & Co., 342 F.2d 304 (9th Cir.), cert. denied, 382 U.S. 892, 86

---

1. The Senate Report on the bill that became the Securities Exchange Act explained the purpose of section 16(b) as follows:

The bill further aims to protect the interests of the public by preventing directors, officers, and principal stockholders of a corporation, the stock of which is traded in on exchanges, from speculating in the stock on the basis of information not available to others. Any change in the holdings of such insiders must be reported to the Commission, and profits realized from the purchase and sale, or the sale and purchase of an equity security

within a period of less than 6 months are recoverable by the corporation. Such a provision will render difficult or impossible the kind of transactions which were frequently described to the committee, where directors and large stockholders participated in pools trading in the stock of their own companies, with the benefit of *advance information* regarding an increase or resumption of dividends in some cases, and the passing of dividends in others.

S.Rep.No.792, 73d Cong., 2d Sess. 9 (1934) (emphasis added).

S.Ct. 180, 15 L.Ed.2d 150 (1965), but was an actual transfer of stock for assets. Given these facts there is no reason to treat the Provident-Foremost transaction as anything other than an orthodox sale of stock. As Professor Loss writes:

> Conversion and merger-like transactions aside, the voluntary exchange of securities, either for assets or for other securities, at least of a different issuer, is ordinarily as much a "purchase" or "sale" as if the consideration had been cash.

2 L. Loss, Securities Regulation 1072 (2d ed. 1961) (footnote omitted).

Provident argues that the transaction was in reality not a purchase, but rather a sale of assets. It points out that it originally preferred cash, but, at Foremost's insistence, compromised to accept convertible stock. But even though this assertion may be correct, it does not alter the nature of the transaction for section 16(b) purposes. Provident exchanged its assets for Foremost stock. The only distinction between this transaction and the usual cash-for-stock sale is the nature of the consideration. In all other respects the transaction was orthodox. *See* Stella v. Graham-Paige Motors Corp., 132 F.Supp. 100, 102–103 (S.D.N.Y.1955), modified, 232 F.2d 299 (2d Cir.), cert. denied, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956). We see no meaningful distinction between consideration in the form of cash and consideration in the form of a corporate asset. Consequently, as was implicit in *Kern County,* the actual-potential-for-abuse threshold test is not relevant to our determination since that potential is presumed if the elements of the section are satisfied.

■ But even if the Provident-Foremost transaction were unorthodox, it involved the potential for speculative abuse of inside information and, therefore, is subject to section 16(b) scrutiny. Under the *Kern County* rule it is not necessary that the plaintiff prove actual abuse; the transaction must be subjected to scrutiny if there is a potential. 411 U.S. at 595, 93 S.Ct. 1736; *see* Smolowe v. Delendo Corp., 136 F.2d 231 (2d Cir.), cert. denied, 320 U.S. 751, 64 S. Ct. 56, 88 L.Ed. 446 (1943); The Supreme Court, 1972 Term—Liability for Insider Trading Under Section 16(b), 87 Harv. L.Rev. 291, 295–296 (1973). In determining whether a transaction has that potential, the *Kern County* Court looked primarily to two factors: (1) Could the defendant reasonably be expected to have had access to inside information? And (2) did he initiate the transaction voluntarily? 411 U.S. at 596–600, 93 S. Ct. 1736.

■ Section 16 requires that we presume that a shareholder who owns 10 percent of his corporation's stock has access to inside information. Apparently, Congress assumed that a 10-percent shareholder would generally have sufficient control of the corporation to have such access.[2] Where, however, the hostility of the management of the corporation to the 10-percent shareholder precludes any real possibility of access to inside information, as in the *Kern County* tender offer situation, the presumption may be rebutted and the court may conclude that he in fact did not have access. 411 U.S. at 598, 93 S.Ct. 1736. Provident has not demonstrated that the Foremost management was hostile. To the contrary, the general cooperation involved in the transaction would indicate that Provident conferred intimately with the Foremost management and could well have had access to confidential corporate information.

■ The second factor the Supreme Court considered in *Kern County* was whether the transaction was voluntary. Implicit in the decision is the limitation that the *Kern County* rule of leniency should not be applied where the defendant could have avoided section 16(b) liability without serious detriment. *See*

---

2. See the testimony quoted in note 5, *infra.*

The Supreme Court, 1972 Term—Liability for Insider Trading Under Section 16(b), 87 Harv.L.Rev. 291, 300–301 (1973). There is no evidence in this case to suggest that Provident was forced to enter into any of the transactions. There is evidence, however, to show that Provident's management was aware of the section 16(b) problem and entered the transaction in spite of the possibility that it might be held liable for the profits. Provident has not suggested that it would have suffered any detriment had it not completed the transactions when it did. Absent a showing of involuntariness, we would not be justified in applying the *Kern County* rule.

After Provident became the owner of more than 10 percent of Foremost's stock, it might have had access to inside information which it could have abused for its speculative advantage. For example, assume Provident learned that Foremost had decided not to declare a dividend in order to maintain the capital it would need to develop the real estate just acquired from Provident. On the basis of this information, Provident might have reasoned that the market value of Foremost stock would rise in response to the news of the acquisition and then fall in response to the news of the decision not to declare a dividend. Provident might have concluded that it should sell its stock just after the acquisition news, but just before the dividend news, became public. Such trading is exactly the kind of speculative abuse that section 16(b) is designed to discourage. Thus, even if we assume that the Provident-Foremost transaction was unorthodox, we are required to subject it to section 16(b) scrutiny.

### B. *Section 16(b) Scrutiny—The Closing Transaction*

Under section 16(b) the issuer of non-exempt securities may recover from a beneficial owner of 10 percent of its outstanding stock any profits realized from the purchase and sale or sale and purchase of the issuer's stock within a period of six months. Foremost argues that the $366,666.66 that Provident received in excess of the principal amount of the debenture it sold to Underwriters is a short-swing profit to an insider and thus, under section 16(b), it may be recovered by Foremost as the issuer. At the outset we are faced with the question of when, for purposes of section 16(b), Provident's sale of the debenture to Underwriters was completed. If the sale was completed on October 21, the date the underwriting agreement was executed, Provident was a beneficial owner of 10 percent of Foremost's outstanding stock and we must decide if the remaining requirements of section 16(b) have been satisfied. On the other hand, if the sale was not completed until October 28, the date of closing and a date subsequent to the distribution of debentures to the shareholders, then Provident was not a beneficial owner of 10 percent at the time of sale, and Foremost cannot recover the profit. Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972).

Federal law governs the construction of terms used in the Securities Exchange Act. Tcherepnin v. Knight, 389 U.S. 332, 337–338, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). *Cf.* Blau v. Lehman, 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed. 2d 403 (1962). Thus, the question of when a sale is complete for purposes of section 16(b) must be decided so as to foster the goals of the federal legislation rather than under concepts of when title passes under state law. Bershad v. McDonough, 428 F.2d 693, 696–697 (7th Cir. 1970), cert. denied, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971); *see* SEC v. National Securities, Inc., 393 U. S. 453, 467, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). In making this determination, the courts have looked to that point at which the insider has relinquished his ability to control the transaction to the extent that he no longer has the potential to use inside information to his own advantage and to the detriment of the public or outside shareholders. *See, e. g.,*

Booth v. Varian Associates, 334 F.2d 1 (1st Cir. 1964), cert. denied, 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965). This ability to control is generally relinquished when the insider is irrevocably bound to sell a specific number of shares at a fixed price, even though the formalities necessary for the transfer of title may not have yet occurred. Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973); Booth v. Varian Associates, 334 F.2d 1 (1st Cir. 1964), cert. denied, 379 U.S. 961, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965); Blau v. Ogsbury, 210 F.2d 426, 427 (2d Cir. 1954).

■ On October 21, when Provident executed the underwriting agreement, it was bound and the price was fixed. After that date, Provident no longer had the potential to use inside information to manipulate the terms and conditions of the agreement. As to Provident, the sale was at that date complete, subject only to the usual conditions precedent to closing.

Provident argues that its obligations under the underwriting agreement were conditional until after closing. But Provident's obligations were conditioned only by the requirements that the registration statement become effective on the date of the agreement, that no stop order issue prior to closing and that Foremost furnish Provident with an opinion letter on the legality of the transaction. None of these conditions subjected Provident to any market risks after the date of the agreement. If the value of Foremost stock had declined in response to the public disclosure of adverse inside information, Provident would nevertheless have received the same price for the stock.

One condition in the agreement, however, may have prevented Provident, for a limited period time, from benefiting from any possible misuse of adverse inside information. Section seven of the agreement gave Underwriters the right to terminate the agreement prior to the time that the registration statement became effective if in its judgment there had occurred "a material unfavorable change in political, financial or economic conditions generally." Presumably, if the price of Foremost stock had fallen substantially in response to unfavorable information that had become public between the time of execution and the time the registration statement became effective, Underwriters could have terminated the agreement. Nevertheless, the condition does not alter the posture of this case since the registration statement, as required by the agreement, became effective on the same date that the agreement was executed.

We hold that for purposes of section 16(b) the sale of stock was completed on October 21, the date that the underwriting agreement was executed, and not on October 28, the date of closing. On the date of sale, therefore, Provident was the beneficial owner of 10 percent of Foremost's stock.

## C. The Initial Transaction

■ In order for section 16(b) liability to attach, however, the insider must have owned 10 percent of the issuer's stock both at the time of the purchase and of the sale. The relevant part of the statute reads: "This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved . . . ." The correct construction of this language has been the basis of a number of law review commentaries,[3] but there have only been three prior cases that have analyzed it.

3. See, e. g., Munter, Section 16(b) Of The Securities Exchange Act Of 1934: An Alternative To "Burning Down The Barn In Order To Kill The Rats," 52 Corn.L.Q. 69 (1966); Comment, Section 16(b): An Alternative Approach To The Six-Month Limitation Period, 20 U.C.L.A.L.Rev. 1289 (1973); 57 Colum.L.Rev. 287 (1957); 70 Harv.L. Rev. 1312 (1957); 9 Stan.L.Rev. 582 (1957).

The first case in which a court analyzed this language was Stella v. Graham-Paige Motors Corp., 104 F.Supp. 957 (S.D.N.Y.1952), in which Judge Kaufman concluded that the language "at the time of" must be construed to mean "simultaneously with," rather than prior to. Thus, he held that the initial purchase in which a person becomes the owner of 10 percent of the issuer's stock is a section 16(b) transaction and that a sale within six months serves as the closing transaction, subjecting the seller to liability for any profit. Judge Kaufman's primary rationale for this conclusion was that if the language were construed to mean "prior to," the owner of a large block of stock could reduce his holdings to below 10 percent and then repurchase without liability attaching. 104 F.Supp. at 959.

When the case eventually came before the Second Circuit, the court approved Judge Kaufman's construction without analysis. 232 F.2d 299, 300–301 (2d Cir.), cert. denied, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956). Judge Hincks dissented, arguing that the initial purchase should not be a transaction within the scope of section 16(b). He reasoned that the language is clear, thus making it inappropriate for the court to go beyond the express terms of the statute and to consider what Congress must have intended. He further reasoned that the Securities Exchange Act is directed at eliminating the profit to be gained by corporate fiduciaries through speculating on the basis of advance information. A 10-percent shareholder, he argued, is presumed to have access to such information because of the control he has over the corporation; but to conclude that a person has access to such information prior to the purchase in which he became a 10-percent shareholder ignores the rationale of the presumption. 232 F.2d at 304–305.

A district court in the Eighth Circuit adopted Judge Hinck's approach without analysis. Arkansas Louisiana Gas Co. v. W. R. Stephens Investment Co., 141 F. Supp. 841, 847 (W.D.Ark.1956). Four-teen years later the Court of Appeals for the Eighth Circuit, the only other court to discuss the issue, adopted Judge Kaufman's approach. Emerson Electric Co. v. Reliance Electric Co., 434 F.2d 918 (8th Cir. 1970), aff'd, 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972). On the rationale that any other view would weaken the statute, the court held that the purchase by which a person becomes a 10-percent shareholder can be one of a pair of transactions necessary for section 16(b) liability. Although acknowledging that the congressional intent is "not as clear as desirable," the court concluded that such a construction was consistent with Congress' purpose in enacting the section.

When *Emerson Electric* came before the Supreme Court, the Court noted the issue, but declined to resolve it because a cross-petition for certiorari had not been filed. 404 U.S. at 421, 92 S.Ct. 596. The Court did, however, repeatedly emphasize that the owner must hold 10 percent "both at the time of purchase and sale." 404 U.S. at 419, 423 and 424, 92 S.Ct. at 599. Slightly more than a year later the Court again had the issue before it, but again declined to resolve the issue by deciding the case on other grounds. In Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 584, 93 S.Ct. 1736, 1739, 36 L.Ed.2d 503 (1973), the Court said:

> Unquestionably, one or more statutory purchases occur when one company, seeking to gain control of another, acquires more than 10% of the stock of the latter through a tender offer made to its shareholders. But is it a § 16(b) "sale" when the target of the tender offer defends itself by merging into a third company and the tender offeror then exchanges his stock for the stock of the surviving company and also grants an option to purchase the latter stock that is not exercisable within the statutory six-month period?

The Court held that the transactions involved in the case before it did not have the potential for speculative abuse of in-

side information and thus were not within the scope of section 16(b). In view of the Court's repeated emphasis of the language "both at the time of purchase and sale" in *Emerson Electric*, it is unclear whether its statement in *Kern County* was intended to resolve the question of whether the initial purchase is a section 16(b) transaction. Since the Court noted that "one or more statutory purchases occur" during a tender offer, it may have intended that the statutory purchases occur only after the purchaser has acquired 10 percent.

This conclusion seems to be required by the Court's later statement that a tender offeror's calculations that he may be able to resell the stock at a profit to a partner of a defensive merger

> do not represent the kind of speculative abuse at which the statute is aimed, for they could not have been based on inside information *obtained from substantial stockholdings that did not yet exist.* Accepting both that Occidental [the tender offeror] made this very prediction and that it would recurringly be an accurate forecast in tender-offer situations, we nevertheless fail to perceive how the fruition of such anticipated events would require, or in any way depend upon, the receipt and use of inside information.

411 U.S. at 597, 93 S.Ct. at 1746 (emphasis added and footnote omitted). Since a person making a decision to purchase enough stock to increase his holdings to 10 percent of a corporation's outstanding shares could not have made that decision "based on inside information obtained from substantial stockholdings," the Court must have intended for section 16(b) to apply only after that person becomes a statutory insider.

This construction of "at the time of" is supported by the legislative history surrounding the enactment of section 16(b). An early draft of the section read:

> (b) It shall be unlawful for any director, officer, or owner of securities, owning as of record and/or bene-

ficially more than 5 per centum of any class of stock of any issuer, any security of which is registered on a national securities exchange—

> (1) To purchase any such registered security with the intention or expectation of selling the same security within six months; and any profit made by such person on any transaction in such a registered security extending over a period of less than six months shall inure to and be recoverable by the issuer, irrespective of any intention or expectation on his part in entering into such transaction of holding the security purchased for a period exceeding six months.

Hearings on S. Res. 84, S. Res. 56 and S. Res. 97, Before the Senate Comm. on Banking & Currency, 73d Cong., 1st Sess., pt. 15, at 6430 (1934) [hereinafter cited as 1934 Hearings]. As is apparent from this draft, the section was originally designed to deter insiders from purchasing stock without any intention of making a long-term investment, but only with the intention of profiting from upward fluctuations in the market price that were predictable on the basis of inside information. The section was directed against an insider who has no intention of changing his investment relationship to the corporation, but rather has an "intention or expectation" to purchase and sell the stock within six months. After the pair of transactions is completed he intends to own exactly the same interest in the corporation as he owned before he began his speculative venture. *See* Blau v. Max Factor & Co., 342 F.2d 304, 308–309 (9th Cir.), cert. denied, 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965); Comment, Section 16(b): An Alternative Approach to the Six-Month Limitation Period, 20 U.C.L.A.L.Rev. 1289, 1294–1295 (1973).

The limitation period was set arbitrarily at six months since the speculative advantage to be gained from inside information is usually short lived; the fluctuations in the market price general-

ly occur for only a short period of time after the inside information becomes known to the public. After a period of six months little speculative advantage remains. See Comment, The Scope of "Purchase and Sale" Under Section 16(b) Of The Exchange Act, 59 Yale L. J. 510, 511 (1950).

As originally drafted the section did not cover the situation where an insider, with inside information adverse to the corporation and indicating a decline in the market price, would sell a large block of stock and later repurchase at a greatly reduced price. Thomas Corcoran, one of the drafters of the section and counsel to the Senate committee, testified as follows:

> Senator BULKLEY. Do you provide for the converse of that, where a man might sell for a short term with the intention of repurchasing?
>
> Mr. CORCORAN. No; it should have been provided for. No; I do not think you need to, sir, because the next section prevents selling short.
>
> Senator BULKLEY. It would not be selling short. He might be a large stockholder, and sell his own stock with the intention of repurchasing.
>
> Mr. CORCORAN. The bill does not cover that case. I do not know whether it should or not.
>
> Senator BULKLEY. Is that not just as reprehensible as to take a short turn on the up side?
>
> Mr. CORCORAN. You see, the next provision prevents either short selling, or selling against the box.
>
> Senator BULKLEY. It would not be a short sale.
>
> Mr. CORCORAN. Or selling against the box.
>
> Senator BULKLEY. It would not be against the box. It would be his own stock.
>
> Mr. CORCORAN. You mean a case where he sold the stock, and within 6 months bought it back at a lower price?
>
> Senator BULKLEY. Yes. A man having a large amount of stock might know that his company was going to pass a dividend, and then sell it with the intention of purchasing after the news was out.
>
> Mr. CORCORAN. Possibly a provision to catch that should go into the statute. That does not happen as often as the other case.

1934 Hearings, *supra*, at 6557–6558.

Apparently in response to Senator Bulkley's suggestion, the language of the section was amended to read:

> [A]ny profit realized by [a statutory insider] from any purchase and sale, or *any sale and purchase,* of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer . . . . (Emphasis added.)

Although the amended language includes a sale and repurchase by an insider, there is no indication that the amendment was designed to alter the section's goal of deterring insiders from speculating on the basis of inside information obtained because of "substantial stockholdings." Indeed, the amended version articulates this goal even more clearly than the original draft. In addition to the "purchase and sale, or sale and purchase" language, Congress added a preamble enunciating that the section was enacted

> [f]or the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by *reason of his relationship* to the issuer . . . .

15 U.S.C. § 78p(b) (emphasis added).

The drafters recognized, however, the difficulty of proving that the insider actually intended a short-swing transaction when he made his original decision. Mr. Corcoran, after reading the draft section to the committee, testified:

> That is to prevent directors receiving the benefits of short-term specula-

tive swings on the securities of their own companies, because of inside information. The profit on such transaction under the bill would go to the corporation. You hold the director, irrespective of any intention or expectation to sell the security within 6 months after, because it will be absolutely impossible to prove the existence of such intention or expectation, and you have to have this crude rule of thumb, because you cannot undertake the burden of having to prove that the director intended, at the time he bought, to get out on a short swing.

1934 Hearings, *supra,* at 6557. In order to ameliorate this difficulty of proving intention or expectation, the section created a statutory presumption that a person with access to *inside information* who purchases and sells, or sells and repurchases, within a six-month period does so with the intent to speculate rather than to invest. That the drafters intended for the presumption to be conclusive is clear from the following testimony:

> Senator GORE. You infer the intent from the fact.
>
> Mr. CORCORAN. From the fact.

Senator KEAN. Suppose he got stuck in something else, and he had to sell?

Senator BARKLEY. All he would get would be what he put into it. He would get his original investment.

Mr. CORCORAN. He would get his money out, but the profit goes to the corporation.

Senator KEAN. Suppose he had to sell.

Mr. CORCORAN. Let him get out what he put in, but give the corporation the profit.

1934 Hearings, *supra,* at 6557.

 Since the presumption of intention or expectation is conclusive,[4] it is necessary that it be narrowly construed so as to apply only to the class of persons who can reasonably be expected to have access to inside information. The hearings demonstrate that Congress intended that the class not be defined too broadly. As originally drafted the presumption applied, in addition to corporate officers and directors, to shareholders who owned five percent of a corporation's stock. The Senate Committee was concerned that a person with that percentage of shares may not have access to inside information[5] and increased the ownership to 10 percent.

4. The Supreme Court has recently rejected an argument that section 16(b) should be construed as creating a rebuttable presumption. *See* Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 438, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972) (Douglas, J., dissenting).

5. Senator Kean expressed his concern as follows:

> Senator KEAN. I think it is all right to apply it to a director or officer, but I think to require the ordinary investor——
>
> Mr. CORCORAN. Five percent is a lot in a modern corporation. Many corporations are controlled by 5 percent or 10 percent.
>
> Senator KEAN. They may own it or they may sell it. This applies to all corporations, and you are getting down to the point where you are interfering with the individual a good deal there. I agree with you with respect to the officers and directors.

> Mr. CORCORAN. A stockholder owning 5 percent is as much an insider as an officer or director. Whether he is a titular director or not, he normally is, as a practical matter of fact, a director.
>
> Senator KEAN. He might not be.

Hearings on S.Res. 84, S.Res. 56 and S.Res. 97, Before the Senate Comm. on Banking & Currency, 73d Cong., 1st Sess., pt. 15, at 6556 (1934) [hereinafter cited as 1934 Hearings].

Samuel Untermyer, an attorney from New York on whose expertise the Committee greatly relied, testified of the same concern:

> Mr. PECORA. The theory was that the ownership of 5 percent of the stock would practically constitute him an insider, and by virtue of that position he could acquire confidential information which he might use for his own enrichment by trading in the open market, against the interests of the general body of the stockholders. That is the main purpose sought to be served.

As the Committee testimony indicates, the section also creates a presumption that officers, directors and 10-percent shareholders fall within the class of persons who may reasonably be expected to have access to inside information (statutory insiders). It does not appear, however, that this presumption (as distinguished from the presumption of intent to speculate) is always conclusive, since the Supreme Court has held that at least in some situations it may be rebutted. Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

Nevertheless, the legislative history demonstrates that the class was not intended to include outsiders. As origi-

Mr. UNTERMYER. I understand the purpose, and I understand the wisdom of it.

Mr. PECORA. You approve of the principle?

Mr. UNTERMYER. I approve of the principle, but I do not approve of its application to anybody who owns 5 percent, who is not an officer or director, and has no fiduciary relationship.

Mr. PECORA. If you were to raise that limitation to 20 percent of a listed or registered security, you probably would have difficulty in having it apply to any individual, because it is a grave question whether, in any listed security, there is any individual who owns 20 percent or more of the outstanding stock.

Mr. UNTERMYER. If he owns less, and is not an officer or director—

Senator KEAN. If he is a director or officer, I think it should apply.

Mr. UNTERMYER. I agree. I think it should apply. But if he is not—if he has no relation whatever to the corporation, except that he is an investor and owns that amount of security, I do not see why these penalties should be applied to him. They are too severe.

. . . .

Mr. PECORA. The only point I want to make is that with that evidence in mind, that management control of an active stock could be obtained through control of 10 percent of the outstanding stock—and there was a large amount of stock outstanding—where an individual owned as much as 5 percent or more, he would be in a position, through that ownership of a block of stock of that size, to virtually be an insider, and he could very well dictate, with one or two others, elections to the board of directors.

Mr. UNTERMYER. So, you will not let anybody acquire over 5 percent.

Mr. PECORA. It is open to anybody to do it, but he cannot use the information to trade for his own account against the public interest.

Mr. UNTERMYER. But he cannot get any profit out of it. He is foreclosed from making anything out of it, and the result is that he will not buy it.

Mr. PECORA. He can profit from it provided his transactions are more than 6 months apart. It is designed avowedly to prevent insiders from utilizing their position to trade for their own account and against the interests of the general body of the stockholders. The only penalty against it, as you have observed, is that he has to disgorge his profits for the benefit of all the stockholders.

Mr. UNTERMYER. That is a penalty that will prevent him from buying any more stock, and you will hurt the market in the stock. He may have to buy to protect the stock.

Mr. PECORA. If he buys and does not sell again for another 6 months, he does not have to account.

Mr. UNTERMYER. But he may just buy for the purpose of protecting the stock, and he may want to sell it as soon as he can. He may not be an insider at all. There are many corporations owned or controlled by big banking houses that have not 1 percent of the stock. They know more about it. They have got more information than the follow (sic) who owns 30 percent of the stock. They know all about it because they are running it. To take one extreme case, like the Wiggin case, and predicate legislation of this kind upon it is very dangerous because, as you know, Mr. Pecora, hard cases make bad laws.

. . . . .

Mr. UNTERMYER. I must say [the section] is likely to do more harm than good.

The CHAIRMAN. You think that that 5 percent ought to be made 20?

Mr. UNTERMYER. I think so—15 or 20; some substantial amount.

Senator KEAN. Mr. Untermyer, would it not be satisfactory if you made it apply to the officers or directors?

The CHAIRMAN. That is another provision.

Mr. UNTERMYER. I think that 5-percent provision should apply to the officers and directors, but I do not think it should apply to anybody who wants to accumulate a larger amount than 5 percent of the stock. *Id.* at 7741–7743.

nally drafted subsection (b)(3) of the section provided that profits received by outsiders from short-swing speculation entered on the basis of confidential information received from insiders could be recovered by the issuer.[6] The provision was deleted from the final draft apparently because the burden of proof required to support a recovery was thought to be too difficult.[7] Since the original draft of the section contained a subsection expressly imposing liability on outsiders and a subsection expressly imposing liability on insiders, the deletion of the subsection imposing liability on outsiders, without material change in the other subsection, indicates that Congress ultimately decided to exclude outsiders from the operation of the statutory presumption. If Congress had intended for outsiders to be covered by the statute, logically it would have either altered the language of the remaining subsection to provide expressly for such

---

6. At one time prior to passage, subsection (b)(3) provided:

> (b) It shall be unlawful for any director, officer, or owner of securities, owning as of record and/or beneficially more than 5 per centum of any class of stock of any issuer, any security of which is registered on a national securities exchange—
>
> . . . . .
>
> (3) To disclose, directly or indirectly, any confidential information regarding or affecting any such registered security not necessary or proper to be disclosed as a part of his corporate duties. Any profit made by any person, to whom such unlawful disclosure shall have been made, in respect of any transaction or transactions in such registered security within a period not exceeding six months after such disclosure shall inure to and be recoverable by the issuer unless such person shall have had no reasonable ground to believe that the disclosure was confidential or was made not in the performance of corporate duties.

1934 Hearings, *supra*, note 5, at 6430.

7. The following testimony indicates the Committee's concern over the difficulties in proving an abuse of inside information:

> Mr. CORCORAN. Subparagraph (3) affects the friends to whom these corporation directors and officers and big stockholders pass on a tip that the stock is going up for a short swing, and through whom they may conceal their own operations, since the friend may be simply acting as an agent through whom the director, officer, or principal stockholder effects the transaction for his own benefits.
>
> . . . . .
>
> Senator CAREY. That would mean that if an oil company expected to bring in a well, and an officer knew of it and imparted that information to a stockholder, it would be contrary to this law.
>
> Mr. CORCORAN. If that were confidential, and if the stockholder to whom the tip was imparted knew it was confidential and should not have been disclosed.
>
> . . .
>
> Then, if there were any profit in the 6 months swing in the stock, the company would get the profit.
>
> Senator CAREY. Suppose he did not say it was confidential, but said they had a good well coming in tomorrow, and this fellow went out and bought some stock?
>
> Mr. CORCORAN. The person who is being sued by the company, if he can show that he had no reasonable ground to believe that the disclosure was confidential or was made not in the performance of corporate duties, would not be liable.
>
> Senator BARKLEY. How can the digging of an oil well be confidential? Anybody who passes along would see it.
>
> Mr. CORCORAN. I do not know anything about the oil business.
>
> Senator CAREY. The information is not always given out.
>
> Senator GORE. They can tell whether they are going to produce, or whether it is a dry well.
>
> Senator BARKLEY. They cannot tell until they finish.
>
> Senator CAREY. I do not see how you can determine when the information is confidential and when it is not.
>
> Mr. CORCORAN. That would depend, sir, upon the nature of the business of the company and the nature of the information.
>
> Senator CAREY. Suppose he said, "I have a letter here today from our man out in the field, and I am certain from what he says that we are going to have a good well." The man goes out into the market and buys.
>
> Mr. CORCORAN. Whether that is a revelation of confidential information depends upon all the circumstances surrounding the case.
>
> Senator CAREY. I think you are breeding a lot of lawsuits here.
>
> Senator GORE. If he says, "strictly between us two", that would be confidential.

1934 Hearings, *supra*, note 5, at 6560-6561.

coverage or amended the language of the separate subsection to overcome the objections. Thus, we conclude that the class encompassed by subsection (b)(2) (statutory insiders) was not intended to include outsiders. *See* 9 Stan.L.Rev. 582, 588 n.32 (1957).

■ Since a person who decides to purchase enough stock to increase his holdings to 10 percent of a corporation's outstanding shares is an outsider at the time he makes his investment decision, he does not fall within the class of persons to which the conclusive presumption was intended to apply. He may have made that decision on the basis of inside information, but such inside information could not have been acquired, in the language of the statute, "by reason of his relationship to the issuer," or in the language of the Supreme Court, "from substantial stockholdings that did not yet exist." Kern County Land Co., *supra*, 411 U.S. at 597, 93 S.Ct. at 1746. We hold that the initial purchase by which a person increases his holdings to 10 percent of a corporation's outstanding stock is not a section 16(b) transaction and that the conclusive presumption imputing an intent to speculate does not apply to such a person who sells within six months. The statutory language "at the time of," in order to be consistent with the rationale of the statutory presumption, must be construed to mean prior to the time when the decision to purchase is made.

■ This construction, however, should not be applied to a transaction that is not an initial purchase but in reality is a repurchase or a closing transaction. It would be inconsistent with the rationale of the presumption and with the legislative history to allow a principal shareholder to sell his holdings below the 10 percent level and then repurchase at a profit within six months.[8] Where a shareholder was within a class of persons who had access to inside information by reason of their relationship to the issuer prior to making his initial decision to speculate, the conclusive presumption should be applied if simultaneously with the conclusion of the closing transaction he is the owner of 10 percent of the issuer's stock. Although this conclusion mandates that the language "at the time of" means *prior to* in the case of an initial transaction and *simultaneously with* in the case of a closing transaction, we do not believe that this "inconsistency" is inconsistent with the rationale of the section. In order for the statutory presumption of intention or expectation to deter speculation rather than to impose an arbitrary hardship on a good faith investor, it must apply only to shareholders who, at the time they make the decision to purchase or to sell, are within the class of persons who can reasonably be expected to have access to inside information by reason of their relationship to the corporation. This conclusion does not provide a consistent construction of the language "at the time of" for both the initial and the closing transactions, but it is consistent with the rationale of section 16(b)—a consistency that we believe is much more important than the consistency of terms. It is also consistent with the Supreme Court's instruction that

> where alternative constructions of the terms of § 16(b) are possible, those terms are to be given the construction that best serves the congressional purpose of curbing short-swing speculation by corporate insiders.

---

8. One example of the speculative abuse of inside information that the section was designed to prevent was reported to Congress as follows:

> In another case, the president of a corporation testified that he and his brothers controlled the company with a little over 10 percent of the shares; that shortly be-

> fore the company passed a dividend, they disposed of their holdings for upward of $16,000,000 and later repurchased them for about $7,000,000, showing a profit of approximately $9,000,000 on the transaction.
> S.Rep.No.792, 73d Cong., 2d Sess. 9 (1934).

Reliance Electric Co. v. Emerson Electric Co., 404 U.S. 418, 424, 92 S.Ct. 596, 600, 30 L.Ed.2d 575 (1972) (footnote omitted). *See* Kern County Land Co. v. Occidental Petroleum Corp., 411 U.S. 582, 595 (1973). *See also* 9 Stan.L. Rev. 582, 588 n. 3 (1957).

With this construction, section 16(b) should be relatively easy to apply. Every section 16(b) fact situation involves a pair of transactions—an initial transaction and a closing transaction. If the defendant is a statutory insider prior to making his decision to enter the initial transaction—regardless of whether it is a purchase or a sale—the conclusive presumption imputing to him an intent to speculate on inside information must be applied if simultaneously with the closing transaction—regardless of whether it is a sale or a repurchase—he is the owner of 10 percent of the issuer's stock and if both transactions have occurred within six months.

We concede that this construction of section 16(b) will not prevent all of the abuses of inside information. A person may well have had inside information at the time he makes a purchase that makes him a 10-percent shareholder. But he may also have had inside information at the time he makes a purchase that makes him a 9-percent shareholder. Additionally, a 10-percent shareholder who sells and repurchases *after* six months may have made the decision to do so on the basis of inside information. But in order for the conclusive presumption to apply to the transactions, the person must have had access to information at the time of the initial transaction and have executed the closing transaction within six months. If liability is imposed without either of these requirements having been satisfied, the ration-

ale of the presumption will be destroyed. Section 16(b) was not intended to prevent all abuses of inside information, but only speculative abuses of inside information by statutory insiders. Persons injured by other abuses must seek a remedy in other securities laws. Blau v. Max Factor & Co., 342 F.2d 304, 307 (9th Cir.), cert. denied, 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965). For example, a person injured in connection with the sale or purchase of securities because of the abuse of material inside information may have a remedy under section 10(b) of the Securities Exchange Act and rule 10b–5. *See* Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 495 F.2d 228 (2d Cir. 1974); Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90 (10th Cir.), cert. denied, 404 U. S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 848 (2d Cir. 1968), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); In re Cady, Roberts & Co., 40 S.E.C. 907 (1961). Although an injured person may be required to prove actual abuse in these cases, such cases do not fall within the ambit of those practices that Congress felt were so injurious to the investment community as to require a conclusive presumption once the fact of short-swing trading at a profit is proved.

In this case Provident was not a statutory insider at the time of its initial purchase. The only possible section 16(b) transaction was the sale of the debenture to Underwriters. Foremost has not alleged a closing transaction within six months of this initial transaction. Absent a pair of section 16(b) transactions within the statutory period, no liability can attach.

Affirmed.