**ALLIS–CHALMERS MANUFACTURING COMPANY, a Delaware Corporation, Plaintiff-Appellant,**

v.

**GULF & WESTERN INDUSTRIES, INC., a Delaware Corporation, Defendant-Appellee.**

Nos. 74–1266, 74–1267.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1975.

Decided Sept. 29, 1975.

Certiorari Denied Jan. 19, 1976.
See 96 S.Ct. 865.

Certiorari Denied Feb. 23, 1976.
See 96 S.Ct. 1142.

336

S. Hazard Gillespie and Sheila T. McMeen, Davis Polk & Wardwell, New York City, H. Blair White, Sidley & Austin, Chicago, Ill., William H. Levit, Jr., New York City, Hughes Hubbard & Reed, Los Angeles, Cal., and W. Stuart Parsons, Quarles & Brady, Milwaukee, Wis., for plaintiff-appellant.

John A. Guzzetta, Bernhardt K. Wruble, Conrad K. Harper and Lindsay A. Lovejoy, Jr., Simpson, Thacher & Bartlett, New York City; Wesley G. Hall and Larry D. Blust, Jenner & Block, Chicago, Ill., for defendant-appellee.

Before CLARK,* Associate Justice (Retired), SWYGERT and PELL, Circuit Judges.

SWYGERT, Circuit Judge.

This appeal presents several issues concerning the proper construction of section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). The section, which seeks to prevent misuse of internal corporate information, requires certain statutorily defined corporate insiders to remit to their corporation any profits realized as a result of any transaction consisting of a purchase and subsequent sale, or sale and repurchase, which is completed within six months. Included among the insiders covered by the section are owners of more than ten percent of any class of equity security registered under the provisions of section 12 of the Act, 15 U.S.C. § 78*l*. In this case we must determine whether the section applies to an initial purchase of more than ten percent of a covered security by one who was an outsider until that purchase was consummated. In addition we must decide whether the facts in this case so completely preclude the possibility of misuse of inside information that application of the section to this type of transaction could serve no purpose. Finally, questions exist as to the proper method of determining the profits realized where a violation is found.

In May of 1968, Gulf & Western Industries, Inc.[1] began actively to contemplate the acquisition of a substantial interest in Allis-Chalmers Manufacturing Company.[2] In this connection, Charles G. Bludhorn, chairman of the board of Gulf & Western, and David N. Judelson, its president, contacted Robert S. Stevenson, the chairman of the board at Allis-Chalmers. First contact was made on May 6, 1968. Bludhorn and Judelson indicated that Gulf & Western was considering an exchange offer and that they would keep Stevenson advised as these plans developed. On the following day Stevenson was informed that an exchange offer would immediately be announced by Gulf & Western, pursuant to which Gulf & Western would seek to

---

* The Honorable Tom C. Clark, Associate Justice (Retired) of the Supreme Court of the United States, is sitting by designation.

1. Gulf & Western is a Delaware corporation engaged in diversified pursuits including manufacturing, distribution, mining, agricultural, and other operations. The record indicates that prior to the transaction here involved, Gulf had bought and sold controlling interests in a number of corporations.

2. Allis-Chalmers is a Delaware corporation whose common stock is, and was at all relevant times, registered on the New York Stock Exchange pursuant to 15 U.S.C. § 78*l*.

acquire 3,000,000 shares of Allis-Chalmers common stock in return for a per share consideration of $11.50 cash plus $12.50 principal amount of a Gulf & Western six percent subordinated debenture due in 1988 plus 9/10 of a ten-year registered Gulf & Western warrant to purchase Gulf & Western common stock at fifty-five dollars per share.

The offer was formally made through a prospectus dated July 1, 1968. By its terms, Gulf & Western agreed to accept Allis-Chalmers shares tendered prior to July 19, 1968 on a pro-rata basis up to a total of 3,000,000 shares accepted. If less than 3,000,000 shares were tendered by July 19th, then Gulf & Western further agreed to accept additional shares thereafter on a "first-come, first-served basis," up to the 3,000,000 limit. The offer was subject to the approval of the Gulf & Western stockholders at a meeting to be held on July 29, 1968, and was to expire in any event on July 30, 1968 unless extended prior thereto by Gulf & Western. All tenders of Allis-Chalmers stock were to be irrevocable by the tendering party. The offer was fully subscribed by July 19, 1968 so that no shares tendered thereafter could be accepted under the terms of the offer, no extension having been made by Gulf & Western. The shareholders of Gulf & Western approved the offer on July 29, 1968.

After this initial acquisition, on August 28, 1968, Gulf & Western entered into an agreement with Oppenheimer Fund, Inc. whereby they would acquire 248,000 additional shares of Allis-Chalmers stock owned by Oppenheimer in return for 496,000 warrants for the purchase of Gulf & Western common stock. The closing date for the agreed exchange was to be September 30, 1968. The warrants were not to be registered initially, but according to the agreement Gulf & Western was to file a registration statement for these warrants and for the shares of Gulf & Western stock to be issued thereunder on or before April 30, 1969. In addition, Gulf & Western agreed that if the registration statement became effective later than December 31, 1968, it would guarantee an average per warrant price of $13.50 for any warrants sold by Oppenheimer within ninety days after actual registration. This was to be accomplished either by a payment from Gulf & Western of the difference between the average sale price and $13.50, or by Gulf & Western supplying a purchaser willing to take the warrants at the guarantee price or better.[3] This exchange was carried out, the closing being held on September 30, 1968. The registration statement did not become effective until after December 31, 1968, and after an agreed extension of the guarantee period, Oppenheimer in fact sold 487,500 warrants subject to the guarantee and obtained a payment thereunder from Gulf & Western in the amount of $2,154,437.50 on June 5, 1969.

One month after the Oppenheimer acquisition, on October 31, 1968, Gulf & Western reached an agreement with White Consolidated Industries, Inc. whereby White would purchase Gulf & Western's entire holding in Allis-Chalmers, which at this point consisted of 3,248,000 shares of Allis-Chalmers common stock. This agreement was the result of negotiations between Gulf & Western and White which had commenced with a meeting between Mr. Bludhorn and White representatives on September 30, 1968, the very day that the Oppenheimer exchange was closed.[4]

---

**3.** The agreement provided that if the guarantee were invoked Gulf & Western would have three business days during which to find a purchaser willing to pay a higher price than the price at which Oppenheimer intended to sell the warrants. If no such purchaser was found, then Oppenheimer would be free to sell and to seek a cash payment under the guarantee for all shares sold during the ninety-day period.

**4.** On September 13, 1968 Allis-Chalmers chairman Stevenson had on his own initiative met with Bludhorn and Judelson of Gulf & Western and had, according to his recollection at trial, told them that things did not look good for

The White acquisition was consummated on December 6, 1968. Gulf & Western received in return for its Allis-Chalmers stock 250,000 unregistered shares of White common stock plus $20,000,000 in cash plus a 180-day promissory note at 8.5 percent interest in the face amount of $93,680,000. The promissory note was given in lieu of cash pursuant to a payment option in the October 31, 1968 agreement with Gulf & Western and was in fact redeemed with interest by White on March 20, 1969.

On January 6, 1969 this action was commenced by Allis-Chalmers in the Eastern District of Wisconsin. On motion of Gulf & Western the cause was transferred to the Northern District of Illinois. 309 F.Supp. 75 (E.D.Wis.1970). A trial was conducted without a jury, and Gulf & Western was held liable to Allis-Chalmers for all profits realized as a result of the purchase and sale of all 3,248,000 shares of Allis-Chalmers stock. Profits were found by the district judge in the amount of $1,135,838.00 and judgment was entered against Gulf & Western and in favor of Allis-Chalmers in this amount. 372 F.Supp. 570 (N.D.Ill. 1974). Both parties appeal from this judgment.

## I

The first question we must resolve is whether the transaction consisting of initial acquisition of 3,000,000 shares of Allis-Chalmers common stock and its subsequent sale by Gulf & Western falls within that class of transactions subject to section 16(b) of the Securities Exchange Act. That section provides in relevant part:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any prof-

it realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. . . . This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

The term "beneficial owner" is defined in section 16(a) and includes "[e]very person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of any equity security . . . registered pursuant to [15 U.S.C. § 78(*l*)]."

There is nothing in the record to indicate that prior to the July 1968 exchange offer Gulf & Western had any legally significant relationship with Allis-Chalmers. Only when the July acquisition was completed did Gulf & Western become a "beneficial owner" within the meaning of section 16(b). Thus, there is no possibility under the facts of this case that Gulf & Western could have made "unfair use of information . . . obtained . . . by reason of [its] relationship to [Allis-Chalmers]" until after the initial acquisition. The precise question is therefore whether section 16(b) applies to a purchase/sale short-swing transaction where the decision to initiate

Allis-Chalmers. He refused to quantify the bad news for the Gulf & Western representatives in response to their specific questions, but he clearly disclosed to them his personal negative evaluation of the situation at Allis-Chalmers. Stevenson's notes for this meeting

reflected his belief at that time that the Gulf & Western people were "getting nervous" about their block of stock in Allis-Chalmers. At trial, Stevenson testified that he "had the feeling right then [at the September 13, 1968 meeting] that they were thinking about disposing of it."

the transaction (i. e., purchase the stock) could not have been premised on use of information obtained through a section 16(a) insider relationship with the issuing company. We are mindful, however, that the intent and purpose of legislation "must [be] glean[ed] from the statute as a whole rather than from isolated parts." *Adler v. Klawans,* 267 F.2d 840, 844 (2d Cir. 1959). We therefore have examined the language of section 16(b) in its totality. This examination, and a consideration of the legislative development of section 16(b) convinces us that the statute was never intended to reach such a transaction.

## A

We realize that a contrary view has been taken in the Second and Eighth Circuits. On the other hand, the Ninth Circuit has recently decided this issue consistent with our interpretation, based on a thorough review of the legislative history of section 16(b).[5] A discussion of these conflicting precedents is pertinent.

In *Stella v. Graham-Paige Motors Corp.,* 104 F.Supp. 957 (S.D.N.Y.1952), *recognized as law of the case,* 132 F.Supp. 100 (S.D.N.Y.1955), *aff'd in part, remanded in part on other grounds,* 232 F.2d 299 (2d Cir. 1956), *cert. denied,* 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956), District Judge Samuel H. Kaufman was confronted with the following facts. In 1945 the Kaiser-Frazer Corporation was organized. Its capital structure consisted of 500,000 shares of common stock, half of which were owned by Graham-Paige Motors Corporation. In that same year Kaiser-Frazer issued 1,700,000 new shares of common stock, bringing the proportional Graham-Paige interest down from fifty percent to 11.34 percent. On January 23, 1946 Kaiser-Frazer issued 1,800,000 additional shares. This cut the Graham-Paige interest down to 6.25 percent, or well below the level constituting section 16(b) beneficial ownership. About a year later, on February 10, 1947, Graham-Paige purchased 750,000 additional shares of Kaiser-Frazer stock. With the completion of this acquisition, Graham-Paige was once again a beneficial owner, with holdings constituting twenty-one percent of Kaiser-Frazer stock. One day less than six months later, on August 9, 1947, Graham-Paige sold 155,000 shares of Kaiser-Frazer common stock. A stockholder of Kaiser-Frazer brought suit on behalf of that corporation to recover any profit from that sale.

Judge Kaufman held that the purchase on February 10, 1947 by which defendant Graham-Paige resumed its beneficial owner status could be matched with the sale of August 9, 1947 to constitute a section 16(b) transaction even though Graham-Paige was not a benefi-

---

5. Since Part I of this opinion adopts a position on an issue as to which a conflict between circuits exists, this opinion has been circulated to all the active judges of the court. A majority of the active judges have not requested a rehearing *en banc,* and no rehearing will be held, pursuant to Internal Rule 2.

Judge Philip W. Tone has disqualified himself from any consideration of this case and has asked that this fact be noted.

Chief Judge Thomas E. Fairchild and Judge Walter J. Cummings have asked that their votes in favor of rehearing be noted.

Judge John Paul Stevens has asked that his separate views be noted:

STEVENS, Circuit Judge. Although I voted against a rehearing en banc because I agree with Judge Swygert's basic conclusion that the fact of critical importance is the controlling person's presumed access to inside information at the time of his decision either to buy or to sell, I do not agree with his reading of the clause making § 16(b) inapplicable to "any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved . . . ." I think the word "both" refers to both times, that is, the time of purchase and the time of sale, rather than to both a purchase-sale and a sale-purchase. The word "or" in the clause, as well as the Supreme Court's holding in *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575, require this reading. This reading is not contrary to Judge Swygert's holding because Gulf & Western was a controlling person both at the time of its purchase of the 348,000 shares and also at the time of its sale of those shares.

cial owner immediately prior to the February purchase. He based this determination on an "ambiguity" in the exemption language contained in section 16(b). That language reads:

> This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved . . . .

Judge Kaufman saw two reasonable interpretations of the words "at the time of" as used in this passage. He noted that these words could mean "prior to" as defendant contended, or "simultaneously with" as urged by the plaintiff and the Securities and Exchange Commission, as *amicus*. Recognizing that the Congressional purpose behind section 16(b) was "to protect the outside stockholders against at least short-swing speculation by insiders with advance information" 104 F.Supp. at 959 [citations omitted], he adopted the "simultaneously with" construction and held Graham-Paige liable. Judge Kaufman based his holding in part on the fear that the "prior to" interpretation would allow "a person to purchase a large block of stock, sell it out until his ownership was reduced to less than 10%, and then repeat the process, ad infinitum." *Id.* at 959. This construction was accepted as the law of the case by District Judge Dimock in a subsequent district court opinion and was affirmed without analysis by the Second Circuit, Judge Hinks dissenting. Judge Hinks reasoned in part:

> [T]he basic rationale of the Act was such that only completed swing transactions gave rise to the presumption of unethical use of advance information: if one purchased stock on one day, became a director on the next, and sold

some of his stock on the next, any resulting profit was not recoverable by the corporation apparently because a sale alone was thought to be insufficient basis for a drastic presumption that it had been made in violation of a fiduciary duty. In principle, the same rationale is equally applicable to beneficial owners who do not become such until a given purchase is consummated. Under that rationale, the presumption will arise only when both the purchase and the sale were made by one who at the time was a fiduciary. 232 F.2d at 305.

Judge Kaufman's construction continues to be authoritative in the Second Circuit.[6]

In the Eighth Circuit, the *Stella v. Graham-Paige Motors Corporation* construction of section 16(b) was expressly adopted in *Emerson Electric Co. v. Reliance Electric Co.,* 434 F.2d 918 (8th Cir. 1970), *aff'd,* 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972). The Supreme Court's affirmance in *Emerson,* however, never reached this question. 404 U.S. at 421, 92 S.Ct. 596.[7] Looking then to the Eighth Circuit opinion, we find the following factual situation. Emerson Electric became interested in acquiring Dodge of Mishawaka, Indiana, a small manufacturer of electric transmission equipment. Emerson initiated merger negotiations. Dodge rejected the idea of merger, and Emerson then made a tender offer for Dodge common stock. Through this offer, Emerson acquired 13.2 percent of Dodge common stock. Dodge, however, was at the same time negotiating a defensive merger with Reliance Electric, a competitor of Emerson. A proxy fight ensued, and Reliance was the victor, the proposed defensive merg-

---

**6.** *Newmark v. RKO General, Inc.,* 425 F.2d 348, 355–56 (2d Cir. 1970); *Perine v. William Norton & Co., Inc.,* 509 F.2d 114, 118 (2d Cir. 1974).

**7.** The Supreme Court concentrated its analysis exclusively on the "second sale" by which Emerson disposed of its remaining 9.96% interest in Dodge stock. Its decision was founded on

the fact that this sale was made when Emerson was no longer a "beneficial owner" within the terms of the statute, and on the fact that SEC Rule 16a–10, 17 C.F.R. § 240.16a–10, exempts from 16(b) any transaction involving a sale made during a month in which the stockholder never owned more than a 10% interest. *But see* 404 U.S. at 440–41, 92 S.Ct. 596 (Douglas, J., dissenting).

er being approved by the Dodge share-holders. Shortly thereafter Emerson decided to liquidate its position in Dodge prior to final director approval of the Dodge/Reliance merger. Recognizing the possible section 16(b) problem in doing so within six months of the original acquisition, Emerson liquidated in two steps, the first sale bringing its Dodge holdings down to 9.9 percent and the second sale disposing of this balance. Both steps of the liquidation were carried out within six months of the original acquisition.

In determining that Emerson was liable for the profits gained in the first step of the two-step sale of Dodge stock, the Eighth Circuit reasoned that the phrase "at the time of" was ambiguous. The court saw three possible meanings attributable to the phrase in the context of section 16(b): (1) "immediately before" (2) "simultaneously with," or (3) "immediately after." [8] Next, the court noted that in its opinion it was "doubtful that Congress intended it to have one of those meanings in every situation." 434 F.2d at 923. This suggestion was necessary to the court's decision to follow the *Stella* rationale because the Eighth Circuit recognized the logical anomaly of the *Stella* rule, namely, that if "at the time of" is uniformly construed to mean "simultaneously with" the execution of the purchase or sale, then in every

buy/sell transaction in which the sale reduces the defendant's holdings to *below* ten percent of the issuing corporation, as was the case in the first sale in the *Emerson* liquidation, that sale would call into effect the exemption provision. That is, "at the time of" such a sale (the instant it became effective) the defendant would no longer be a beneficial owner. Faced with this legal puzzle, the *Emerson* court was forced to define "simultaneously with" to mean both "before" *and* "after" depending on which end of the short-swing transaction is being analyzed: "a 10 percent stockholder need only be such simultaneously with each transaction; that is, just after a purchase or just before a sale." 434 F.2d at 923 (footnote omitted).[9]

In adopting this construction the court recognized that "the problem of interpretation is difficult and not free of all doubt." Nonetheless, the court was persuaded that the Congressional intent to stop the possible use of inside information by directors, officers and beneficial owners in connection with short-swing transactions demanded this construction to avoid "impracticability of application." Illustrative of the problems perceived by the *Emerson* court was the possibility that one might purchase a block of stock as large as fifty-one percent and then sell within six months with section 16(b) impunity even though *after* the purchase

8. We are unable to see any practical difference between "simultaneously with" and "immediately after" as used in *Emerson*, unless "simultaneously with" merely means *either before or after* depending on which construction best suits the purpose of the statute as perceived by the judge applying it. *See* Note, *Stockholder Acquiring 10% Ownership on Purchase Held Liable for Profits Under Section 16(b) of the Securities Exchange Act,* 57 Colum.L.Rev. 287, 289 (1957) (cited by the Eighth Circuit in *Emerson*). In this light, it is interesting to note the district court's formulation of the issue, and its answer, in the *Emerson* litigation:

[W]e are convinced that "at the time of purchase" includes the time "simultaneously with" the purchase, so that a shareholder becomes subject to the provisions of Section 16(b) immediately upon (that is, at the very moment of) his acquisition of more than 10

per cent of the corporation's stock. *Emerson Electric Co. v. Reliance Electric Co.,* 306 F.Supp. 588, 589 (E.D.Mo.1969) (original emphasis).

The use of the verb "includes" would imply that the district judge perceived the phrase "at the time of" to cover both "prior to" and "simultaneously with," and it is clear from the result reached that his conception of "simultaneously with" is virtually indistinguishable from "immediately after."

9. The quoted words were used by the Eighth Circuit to describe the holding of the Second Circuit in *Stella.* In deciding the case before it, the Eighth Circuit avoided restating this inconsistency by focusing narrowly on the facts presented, but it is clear that the court did adopt this dual-meaning construction of "at the time of."

of this block such an investor would be in a position to obtain inside information and exercise influence over corporate transactions.

The Ninth Circuit, in the recent case of *Provident Securities Co. v. Foremost-McKesson, Inc.,* 506 F.2d 601 (9th Cir. 1974), *cert. granted,* 420 U.S. 923, 95 S.Ct. 1117, 43 L.Ed.2d 392 (1975), rejected the application of section 16(b) to an initial ten percent acquisition. In doing so, the court expressly recognized the contrary decisions of the Second and Eighth Circuits, but declined to follow them. This decision was based in part on an analysis of dicta contained in the Supreme Court's opinions in *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972) and *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), and in part on a review of the legislative history of section 16(b).

The court in *Provident* began its discussion of the initial purchase issue by noting that in *Reliance* the Supreme Court placed great emphasis on the requirement that a section 16(b) beneficial owner/defendant be such a beneficial owner "both at the time of purchase and sale. . . ." 506 F.2d at 608. Turning to the subsequent *Kern* opinion, the court quoted the initial formulation of issues by the Supreme Court in that case:

Unquestionably, one or more statutory purchases occur when one company, seeking to gain control of another, acquires more than 10% of the stock of the latter through a tender offer made to its shareholders. But is it a § 16(b) "sale" when the target of the tender offer defends itself by merging into a third company and the tender offeror

then exchanges his stock for the stock of the surviving company and also grants an option to purchase the latter stock that is not exercisable within the statutory six-month period?

411 U.S. at 584, 93 S.Ct. at 1739.

Recognizing the ambiguity in the first sentence of this passage, the *Provident* court opined that the reference to "one or more statutory purchases" may have indicated that statutory purchases occur only *after* the purchaser has acquired an initial ten percent.[10] The court pointed out that this interpretation would be consistent with the following additional language in *Kern*:

If its takeover efforts failed, it is argued, Occidental knew it could sell its stock to the target company's merger partner at a substantial profit. Calculations of this sort, however, *whether speculative or not* and whether fair or unfair to other stockholders or to Old Kern, *do not represent the kind of speculative abuse at which the statute is aimed, for they could not have been based on inside information obtained from substantial stockholdings that did not yet exist.* Accepting both that Occidental made this very prediction and that it would recurringly be an accurate forecast in tender-offer situations, we nevertheless fail to perceive how the fruition of such anticipated events would require, or in any way depend upon, the receipt and use of inside information. If there are evils to be redressed by way of deterring those who would make tender offers, § 16(b) does not appear to us to have been designed for this task. 411 U.S. at 597, 93 S.Ct. at 1746 (footnote omitted).[11]

---

10. The original offer in *Kern* was made on a first-come, first-served basis, so in all probability a number of the separate purchase transactions involved in the original offer were consummated *after* the particular purchase which put Occidental over the 10% ownership level.

11. Two additional factors undercut any attempt to characterize *Kern* as an approval of

the *Stella* rationale, as suggested by defendants in this case: first, *Stella* was never cited in the *Kern* opinion, and second, the Court specifically noted elsewhere in the opinion that the decision to extend the original offer to encompass an additional 500,000 shares was made *after* the acquisition of a 10% interest by Occidental. 411 U.S. at 584–85, n. 7, 93 S.Ct. 1736.

Turning to the legislative history of section 16(b), the *Provident* court noted that early drafts of the section focused on the intention of a corporate insider in making a purchase of his company's stock, not to change his investment relationship to the corporation, but to capitalize on inside information by entering into a short-swing purchase/sale transaction in an upward market. According to the court in *Provident,* part of the design of this scheme would be for the insider to come out of the transaction with "exactly the same interest in the corporation as he owned before he began his speculative venture." 506 F.2d at 609. These drafts, however, did not cover the converse situation: the sale by an insider of his corporation's stock in a downward market with the intent of replacing it at a lower price over a short term. To remedy this omission, the operative language was modified in part. Where the early drafts had read:

> [A]ny profit made by such person on any *transaction* in such a registered security extending over a period of less than six months shall inure to and be recoverable by the insurer. 506 F.2d at 609 (emphasis added),

the later drafts read:

> [A]ny profit realized by [such person] from any *purchase and sale, or any sale and purchase,* of any equity security of such issuer . . . within any period of less than six months . . . shall inure to and be recoverable by the issuer. 506 F.2d at 610 (emphasis added).

The *Provident* court saw no indication that this change was intended to alter the original intent of focusing on insider status at the time of entering into the short-swing transaction. Moreover, it reasoned that the presumptions created by the statute necessarily assume this premise:

> The drafters recognized, however, the difficulty of proving that the insider actually intended a short-swing transaction when he made his original decision. . . . In order to amelio-

rate this difficulty of proving intention or expectation, the section created a statutory presumption that a person with access to inside information who purchases and sells, or sells and repurchases, within a six-month period does so with the intent to speculate rather than to invest. That the drafters intended for the presumption to be conclusive is clear . . ..

Since the presumption of intention or expectation is conclusive, it is necessary that it be narrowly construed so as to apply only to the class of persons who can reasonably be expected to have access to inside information. The hearings demonstrate that Congress intended that the class not be defined too broadly. . . .

As the Committee testimony indicates, the section also creates a presumption that officers, directors and 10-percent shareholders fall within the class of persons who may reasonably be expected to have access to inside information (statutory insiders). It does not appear, however, that this presumption (as distinguished from the presumption of intent to speculate) is always conclusive, since the Supreme Court has held that at least in some situations it may be rebutted. *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

Nevertheless, the legislative history demonstrates that the class was not intended to include outsiders. . . .

Since a person who decides to purchase enough stock to increase his holdings to 10 percent of a corporation's outstanding shares is an outsider at the time he makes his investment decision, he does not fall within the class of persons to which the conclusive presumption was intended to apply. He may have made that decision on the basis of inside information, but such inside information could not have been acquired, in the language of the statute, "by reason of his relationship to the issuer," or in the language of

the Supreme Court, "from substantial stockholdings that did not yet exist." *Kern County Land Co., supra,* 411 U.S. at 597, 93 S.Ct. at 1746. We hold that the initial purchase by which a person increases his holdings to 10 percent of a corporation's outstanding stock is not a section 16(b) transaction and that the conclusive presumption imputing an intent to speculate does not apply to such a person who sells within six months. The statutory language "at the time of," in order to be consistent with the rationale of the statutory presumption, must be construed to mean prior to the time when the decision to purchase is made. 506 F.2d at 610–14 (footnote omitted).

Finally, the court in *Provident* felt compelled to address another context in which section 16(b) might be applied. In doing so, it created its own modified version of the Eighth Circuit's dual-meaning theory:

> This construction, however, should not be applied to a transaction that is not an initial purchase but in reality is a repurchase or a closing transaction. It would be inconsistent with the rationale of the presumption and with the legislative history to allow a principal shareholder to sell his holdings below the 10 percent level and then repurchase at a profit within six months. Where a shareholder was within a class of persons who had access to inside information by reason of their relationship to the issuer prior to making his initial decision to speculate, the conclusive presumption should be applied if simultaneously with the conclusion of the closing transaction he is the owner of 10 percent of the issuer's stock. Although this conclusion mandates that the language "at the time of" means *prior to* in the case of an initial transaction and *simultaneously with* in the case of a closing transaction, we do not believe that this "inconsistency" is inconsistent with the rationale of the section. In order for the statutory presumption of intention or expectation to deter speculation

rather than to impose an arbitrary hardship on a good faith investor, it must apply only to shareholders who, at the time they make the decision to purchase or to sell, are within the class of persons who can reasonably be expected to have access to inside information by reason of their relationship to the corporation. This conclusion does not provide a consistent construction of the language "at the time of" for both the initial and the closing transactions, but it is consistent with the rationale of section 16(b)—a consistency that we believe is much more important than the consistency of terms. 506 F.2d at 614–15 (footnote omitted).

### B

■ While we agree with much of the analysis in the Ninth Circuit decision in *Provident,* we are convinced that a fundamental conceptual error, initiated in the *Stella* decision, has survived even the careful analysis in *Provident.* It is our view that the legislative history of section 16(b) provides ample support for a construction of that section which obviates any necessity, under any circumstances, to attribute to Congress an intent to utilize a chameleonic definition of the simple phrase "at the time of." We adopt this simplified construction with full recognition that section 16(b) is a remedial statute which has a wholesome purpose. *Emerson Electric, supra,* 434 F.2d at 923 and n. 14. This, of course, begs the real question: what *is* that purpose? Our review of the history of the statute convinces us that in enacting section 16(b) Congress had in mind a specific type of two-part transaction consisting either of a purchase and subsequent sale, or a sale and subsequent repurchase, and did not intend section 16(b) to apply to every *separate* purchase or sale as to which some use of inside information is a theoretical possibility.

As Judge Wallace pointed out in *Provident,* the early draft of section 16(b) did not address the problem of a sale/purchase insider scheme. This ap-

parently was an oversight. The language of the early draft is instructive, however, since it makes clear that Congress originally treated the purchase/sale procedure as a conceptual unit:

(b) It shall be unlawful for any [beneficial owner]

(1) To purchase any such registered security with the intention or expectation of selling the same security within six months; and any profit made by such person *on any transaction in such a registered security extending over a period of less than six months* shall inure to and be recoverable by the issuer, irrespective of any intention or expectation on his part in entering into such *transaction* of holding the security purchased for a period exceeding six months. *Hearings on S. Res. 56 and S. Res. 97, Before the Senate Comm. on Banking & Currency,* 73d Cong., 1st Sess., Pt. 15, at 6430 (1934) (emphasis added).

As used in the initial draft, the term "transaction" obviously included both purchase and sale. The critical point for measuring insider status (*i. e.,* beneficial ownership) was *prior* to the opening purchase of stock. Thus the section focused on purchases made "with the intention or expectation of selling" within six months, but obviated the need for proof of such intention or expectation "in entering into such transaction." Given the fact that the section was aimed at preventing speculation based on abuse of inside information, the section must have contemplated a *pre-existing* beneficial interest: unless the opening purchase was motivated by an insider's anticipation of an upward market, the full purchase/sale transaction could hardly be characterized as "speculative" from the standpoint of insider abuse. *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. at 597, 93 S.Ct. 1736.

When the section was revised to include a sale/repurchase transaction, the term "transaction" was replaced at one point with words describing the two types of insider schemes to be covered by section 16(b):

(b) For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him *from any purchase and sale, or any sale and purchase,* of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. . . .

(emphasis added).

Nothing in this portion of the restricted version would indicate that Congress had abandoned the unitary "transaction" concept. Moreover, retention of specific language obviating the need for independent proof of the insider's intention "in entering into such transaction" would indicate that Congress still meant to focus on insider status "prior to" the unitary transaction in question and not "simultaneous with" the initial step in that transaction, as suggested in *Stella* and later cases.

This construction offers a simple method of determining the application of section 16(b) to a given situation. The question is whether one in a position of presumed access to inside information, that is, a director, officer, or a 10 percent stockholder of a corporation, combined a purchase and a sale of his company's stock, in any order, within a period of six months, thereby producing a profit. If the answer to this question is yes, the profit attributable to the short-swing transaction must be returned to the corporation. The logic of this test is clear: the position of director, officer, or

beneficial owner results in a presumption of access to inside information, and the short-term nature of the transaction results in a presumption that this information motivated a coordinated short-term turn-over. Difficulties in proving either access or motivation justify the conclusiveness of these presumptions.

The final question is whether the language of the exemption clause precludes our construction of section 16(b). The exemption clause provides in pertinent part:

> This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security involved . . . .

Having in mind the purpose of the section as first drafted, there is little reason to believe that this clause was meant to *extend* coverage to situations where the purchase/sale or sale/repurchase could not have been motivated at the beginning of the transaction by inside information. The language of the clause is that of limitation and not of expansion.

More difficult is the question of whether the exemption clause requires a determination of beneficial ownership relative to each component of a short-swing transaction, that is, relative to the purchase and to the sale, regardless of which comes first.[12] The use of the word "both" is confusing in this regard. It is possible to read the word to refer to the separate components of the two types of short-swing transactions; this has been the prevailing view. It is also possible to read this word to refer to the two types of transactions *as transactions.* Neither construction is absolutely apparent. If Congress had intended the first construction it could easily have said "both at the time of the purchase and at the time of the sale." Similarly, if Congress had intended the second construction it could have said "both at the time of the purchase and sale transaction, or the sale and purchase transaction." It did neither, however, and we are left with the task of determining what construction will best serve the intended purposes of the statute. Given the legislative history of section 16(b) and the apparent logic of focusing all insider status inquiries on the period prior to the initiation of the short-swing transaction, we believe Congress intended by the language in question merely to indicate that in the case of both types of short-swing transactions, a person, to be charged with a section 16(b) violation, must only have had insider status prior to the *initial* purchase or sale.[13]

12. We are aware that the Supreme Court's opinion in *Reliance Electric* relies in large part on the fact that Emerson was not a beneficial owner *at the time of the second sale,* when it disposed of its remaining 9.6% interest in Dodge Manufacturing Company. We also note, however, that the Court in *Reliance* purposefully avoided a full analysis of the exemption clause, and in particular its application to the initial purchase in that case. 404 U.S. at 420–21, 92 S.Ct. 596. Our proposed construction of section 16(b) is in full harmony with the "congressional design of predicating liability upon an 'objective measure of proof'" 404 U.S. at 425, 92 S.Ct. at 600, and would in every purchase/sale transaction yield the same result as that reached by the Court in *Reliance.* This is because in every purchase/sale transaction the "last" 10% held by a 16(b) defendant will have *pre-existed* any short-swing transaction, and thus will not be part of any 16(b) transaction for profit computation purposes. Under these circumstances we do not believe that *Reliance* forecloses our further analysis of the exemption clause or our development of an alternative construction thereof.

13. Nothing in the legislative history or the generally accepted purpose of section 16(b) would suggest a reason for requiring a beneficial interest at the time immediately before or after the closing component of a short-swing transaction. Possession of more than a 10% interest at this late stage could in no way relate to the possibility of speculative abuse, since any speculative plan would be formulated prior to the opening purchase or sale, as we have indicated. Furthermore, requiring a beneficial interest in connection with the closing component encourages a dual-meaning approach to the words "at the time of," as evidenced by the opinion of the Ninth Circuit in *Provident.* 506 F.2d at 614. Such a dual-meaning approach defies rational justification in terms of legislative intent, and makes the words themselves almost meaningless. Moreover, in a

Since Gulf & Western did not occupy any section 16(b) insider position prior to the initial purchase of 3,000,000 shares of Allis-Chalmers common stock, its subsequent sale of this stock within six months did not trigger that section's conclusive presumption that a coordinated short-swing transaction based on inside information had taken place.

## II

■■■■ Turning to the September 30, 1968 acquisition of 248,000 shares of Allis-Chalmers common stock, it is not disputed that this purchase was executed at a time when Gulf & Western was a beneficial owner within the meaning of section 16(b).[14] The defendant contends, however, that the Oppenheimer purchase was so much a part of the original take-over bid by Gulf & Western, and so profoundly influenced by alleged resistance to the take-over bid by Allis-Chalmers, that a "pragmatic" approach to the application of section 16(b) is required. It is also contended that pragmatic analysis of the facts in this case compels a finding of nonliability since Gulf & Western was never in fact a functional insider of Allis-Chalmers, and did not, as a factual matter, obtain any inside information in connection with the purchase and sale of the 248,000 shares.

This argument is based on the decision of the Supreme Court in *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973). Gulf & Western urges that

*Kern* is precedent for the proposition that section 16(b) should be applied only in those situations in which the transaction in question "*may* serve as a vehicle for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." 411 U.S. at 594, 93 S.Ct. at 1744 (emphasis added). In our view, the district judge properly determined that the rationale of the *Kern* case does not preclude liability under 16(b) for any profits realized by Gulf & Western as a result of the purchase and sale of the 248,000 shares obtained from Oppenheimer.

In *Kern,* defendant Occidental Petroleum Corporation had sought to initiate a merger with Kern County Land Company. This proved impossible, however, and Occidental decided to attempt a take-over of Kern through a tender offer to the Kern shareholders. In the course of the tender offer Occidental acquired well over ten percent of the outstanding shares of the target corporation. While the offer was in effect, Kern engineered a defensive merger with Tenneco, Inc., involving an exchange of all shares of Kern stock for shares of Tenneco stock. Prior to the closing of the defensive Kern/Tenneco merger, Occidental executed a call option agreement with Tenneco whereby Tenneco acquired the right to purchase from Occidental all Tenneco shares which would be acquired by Occidental in return for its shares of Kern stock under the proposed defensive Kern/Tenneco merger. By its terms,

limited class of cases, such a requirement would allow a careful insider to speculate with 16(b) impunity. Thus, where a beneficial owner anticipated a downward market, he could sell his entire interest and buy back only 9.9% within six months. With regard to this transaction he would never have been a beneficial owner at the time of the repurchase regardless of how the words "at the time of" might be construed, and yet as to that transaction he would have satisfied both section 16(b) presumptions: a) he initiated the transaction when he was an insider, giving rise to a presumption of access to inside information; b) he completed the transaction within six months, giving rise to a presumption that he

used inside information to coordinate the sale and repurchase.

14. Under the construction of section 16(b) adopted in section I of this opinion, we need not pause to assess the significance of the fact that upon the execution of the sale of these shares to White Industries, Gulf & Western was no longer a beneficial owner within the meaning of the statute. It is interesting to note, however, that language in *Provident* would indicate that under the Ninth Circuit's view, liability would be avoided where, as here, one is not a beneficial owner "simultaneously with" the closing component of a section 16(b) transaction. 506 F.2d at 614-15 (quoted at page 346 of this opinion).

this option was not exercisable until six months after the last acquisition of Kern stock by Occidental.

.Subsequently, but within six months of the original acquisition of Kern stock by Occidental, the Kern/Tenneco defensive merger was closed. At this point Occidental became irrevocably entitled to receive Tenneco shares in exchange for its Kern stock. Occidental purposely did not exercise this right until Tenneco exercised its call option more than six months after the last acquisition of Kern stock by Occidental. Immediately upon the exercise of Tenneco's option, Occidental tendered its Kern shares and disposed of its newly acquired Tenneco shares by transferring them to Tenneco pursuant to the option agreement.

In holding that Occidental was not liable to Kern under section 16(b), the Supreme Court determined that neither the acquisition of the irrevocable right to exchange its Kern shares for Tenneco shares pursuant to the defensive merger, nor the execution of the option agreement with Tenneco in reaction to that merger constituted a "sale" by Occidental within the meaning of the statute. The Court pointed out that the exchange of shares was required by the terms of the defensive merger and thus was not a voluntary act attributable to Occidental. No evidence existed to indicate that Occidental had in any way participated in the merger negotiations between Kern and Tenneco, and the continuous, short-term nature of the tender offer precluded any reasonable opportunity for Occidental to have premised its decision to acquire shares in excess of ten percent on insider's knowledge of the Kern/Tenneco merger negotiations.[15] Once the defensive merger "crystallized" Occiden-

tal was left with no real option regarding the conversion of its Kern shares into Tenneco shares. Had Occidental decided to avoid the conversion of its shares under the merger by disposing of the shares to an outside purchaser prior to consummation of the merger, this sale would have fallen clearly within the section 16(b) "sale" concept and "would have left Occidental with a prima facie § 16(b) liability." 411 U.S. at 600, 93 S.Ct. at 1747. In light of these facts the Court held that the involuntary conversion of Occidental's Kern shares into those of Tenneco did not constitute. a section 16(b) "sale" of the Kern stock.

With respect to the option agreement, the Court initially observed that "the mere execution of an option to sell is not generally regarded as a 'sale'." 411 U.S. at 601, 93 S.Ct. at 1748. The Court then proceeded· to examine the particular option agreement at issue to determine whether this agreement amounted to a "sale" within the meaning of section 16(b) in terms of its potential for speculative abuse in connection with the prior acquisition of more than ten percent of the stock of Kern Company. In its analysis the Court noted that the option was not on Kern stock at all, but on Tenneco stock which might be received in exchange for Kern stock in the event that the defensive Kern/Tenneco merger was approved. Implicit in this observation was the recognition that Occidental never intended to sell its Kern holdings so long as Kern County Land Company retained its separate corporate identity. In addition, the facts showed that Occidental had worked diligently to prevent this merger from proceeding to consummation. The option agreement was further limited by the fact that it was a call

15. The Occidental tender offer was on a first-come, first-served basis. Originally the offer was for a total of 500,000 shares, and this offer was announced on May 8, 1967. By May 10, this original offer was fully subscribed. On the following day the offer was extended to encompass an additional 500,000 shares. The offer expired on June 8, 1967 with Occidental owning a total of 887,549 shares of Kern stock. Occidental achieved 10% ownership when it acquired 432,800 shares. Since the decision to extend the offer was made on May 11, one day after the original offer for 500,000 shares was subscribed—and in all probability one day after Occidental first became a beneficial owner—the possibility that Occidental used information gained as an insider as a basis for its extension of the tender offer was virtually non-existent. 411 U.S. at 584–85 & note 6, 93 S.Ct. 1736.

option and therefore unenforceable by Occidental even if the defensive merger were in fact closed and shares exchanged. Given these facts the Court concluded that the execution of the option agreement was also not a section 16(b) "sale" of Occidental's Kern interests.

The purchase and sale of the 248,000 shares of Allis-Chalmers stock acquired from Oppenheimer is not even remotely comparable to the transaction in *Kern*. The question in *Kern* was whether the term "sale" as used in the statute should be construed to apply to two very unorthodox transactions. In resolving this question the Court pierced the form of the two transactions to determine whether in substance either of the transactions amounted to a sale. The Court did not suggest that ordinary, voluntary transactions commonly recognized as purchases and sales would not automatically trigger the application of section 16(b) in future cases as they uniformly have in the past. Indeed the Court specifically recognized that:

> [t]he statute requires the inside, short-swing trader to disgorge all profits realized on all "purchases" and "sales" within the specified time period, without proof of actual abuse of insider information, and without proof of intent to profit on the basis of such information. 411 U.S. at 595, 93 S.Ct. at 1745.

In order to avoid this automatic rule under the *Kern* rationale, it would have to be shown 1) that either the purchase or the sale was an unorthodox transaction, and 2) that an analysis of the unorthodox transaction discloses no possibility of short-term speculative abuse.[16] The Oppenheimer purchase/sale transaction satisfies neither of these tests. The purchase of the Oppenheimer shares in Allis-Chalmers was a simple, voluntary purchase on the part of Gulf & Western.

Certainly the fact that Gulf & Western used its own warrants rather than cash as consideration in this bargain does not render the purchase unorthodox, and we do not understand Gulf & Western so to contend. Similarly, the sale of Gulf & Western's total interest in Allis-Chalmers to White was a simple, orthodox sale, albeit involving a rather complicated consideration element. Unlike the situation in *Kern,* there is nothing in the nature of these transactions which requires a judicial construction of the terms "purchase" or "sale," beyond giving these terms their commonly accepted meanings.

Moreover, even were we to assume that these transactions met the "unorthodox" test, nothing in the nature of these transactions precludes, or even reduces, the possibility of speculative abuse. The purchase from Oppenheimer was a planned business transaction, presumably undertaken as a profitable venture. Similarly, the sale to White was not involuntary, as in the case of a conversion into shares of another corporation pursuant to a defensive merger, nor was it conditional in any respect or tied to the future value of stock in a different corporation. On the contrary, at the time that Gulf & Western made its decision to purchase the 248,000 shares of Allis-Chalmers stock from Oppenheimer it was in a position to anticipate and control its future disposition of those shares. It voluntarily disposed of the shares within six months, *after* obtaining an indication from Allis-Chalmers' chairman that the future of that company did not look any too bright. The possibility certainly existed, therefore, that Gulf & Western's early disposition of its Allis-Chalmers shares was an attempt to avoid the effect of the predicted weakening of Allis-Chalmers' common stock, a prediction gained as an insider of that company. The application of section 16(b) is

16. As the Supreme Court summarized in *Kern :.*

But the involuntary nature of Occidental's exchange, when coupled with the absence of the

possibility of speculative abuse of inside information, convinces us that § 16(b) should not apply to transactions such as this one. 411 U.S. at 600, 93 S.Ct. at 1747.

therefore automatic, and not in any way affected by a failure to prove up actual access to inside information, or improper use of such information.

### III

Having found Gulf & Western liable for any profits realized from its purchase and sale within six months of the 248,000 shares of Allis-Chalmers stock obtained from Oppenheimer, we must determine whether the district court properly evaluated these profits. Allis-Chalmers contends that the district judge erred in his calculation of each element of damages thereby greatly reducing the liability of Gulf & Western.

### A

 With respect to the acquisition of the shares from Oppenheimer, the district court determined that the unregistered Gulf & Western warrants covered by that transaction should be evaluated at a per unit price of $15.92. This figure resulted in a total purchase price evaluation of $7,896,320.00 ($15.92 × 496,000 = $7,896,320.00). Allis-Chalmers points out that experts of both the defendant and the plaintiff evaluated the unregistered warrants at a much lower figure,[17] and that nothing in the record will support the $15.92 per share figure used by the district judge. It contends, therefore, that the value determination by the district court was clearly erroneous and should be set aside. We agree.

The district court's evaluation was the result of an erroneous assumption, namely, that a discount factor of fifteen percent which was recommended by two of

the three expert witnesses did not reflect a full appraisal of the market value to be attributed to the guarantee by Gulf & Western relating to future registration of the 496,000 warrants. Gulf provided in its agreement with Oppenheimer that it would file a registration statement for the warrants (and related stock) on or before April 30, 1969, and in addition, that if it did not make effective a registration statement for these securities before December 31, 1968, it would guarantee Oppenheimer an average gross price per warrant of $13.50 for any warrants sold during the ninety days following the effective date of the registration statement. Also included in the agreement was a provision that in the event Oppenheimer should decide to sell the warrants under the guarantee, Gulf & Western would be given notice of the proposed sale and an opportunity for three business days to provide a buyer who would purchase the warrants from Oppenheimer at a higher price than the price to be obtained by Oppenheimer in its proposed sale. Each of the experts who testified on the subject of valuation of the unregistered warrants expressly indicated that his evaluation was based in part on the provisions of this guarantee. Each also expressed his final valuation in terms of a discount to be applied to the low market price for comparable registered Gulf & Western warrants being sold on the American Stock Exchange on the date of closing.

The district judge adopted a discount figure of fifteen percent as representative of the opinions of the experts and as realistic,[18] and applied this discount to the volume-weighted average price,[19]

---

17. Plaintiffs' expert witnesses were Robert N. Hampton and Fred D. Stone. Hampton testified that considering all factors involved in the purchase agreement, a valuation per warrant of $14.25 would be proper, representing a discount of 9.5% from the low market trade on the closing date for identical registered warrants. Stone, also considering the entire agreement between the parties, testified that a range of from $12.92 to $13.70 would be accurate, representing a discount from low market

of from 13% to 18%. Defendants' expert, Gabriel J. Danihel, on a similar basis, testified that a discount of 15% would be proper.

18. We find no substantial disagreement between the parties as to the propriety of this figure.

19. The volume-weighted average price is determined for a given day by breaking the day's transactions into groups according to the price at which the security was traded, and then

rather than the low price for registered warrants on the date of closing as urged by plaintiffs. He thereby arrived at a fair value per unregistered warrant of $13.69. Had the judge adopted $13.69 as the section 16(b) purchase price we would have no trouble affirming [20] as to this element of his calculation of damages.

The district judge went on, however, to add to this "fair value" figure an increment of $2.23 as representing the value of the guarantee to register within three months, thereby attaining a final per unit valuation of the unregistered warrants of $15.92, or $.15 *more* than the low market transaction for registered warrants on the closing date and only $.19 less than the volume-weighted average price for that day for identical registered warrants. This was clearly error. Aside from the fact that the experts were nearly unanimous in their lower valuation of the unregistered warrants *with the guarantee* "for 16(b) purposes,"

and aside from the fact that Oppenheimer independently evaluated the warrants at $13.63 per warrant in a filing with the Securities and Exchange Commission, the addition of $2.23 to the conceded fair value of $13.69 per warrant does not withstand logical examination.

The effect of the guarantee as to Oppenheimer was twofold. First, it provided an incentive for Gulf & Western to make its best efforts to attain early registration, thereby reducing the period of non-liquidity for Oppenheimer. Second, it provided a limited hedge against significant loss on Oppenheimer's investment in the event Oppenheimer determined to sell its warrants within a period of ninety days after the effective date of registration in the event the December 31, 1968 registration date was not met. It did not remove all risk, however, since if the early registration date was met, no guarantee would be effective, and similarly, if the market in the warrants remained relatively con-

multiplying each price times the number of shares traded at that price, and dividing the total of these products by the total number of shares traded for the day. We discuss the propriety of using the volume-weighted average price in section III B, *infra*, in connection with the valuation of certain unregistered shares of White Consolidated Industries. That discussion applies to the use of the volume-weighted average price here, as well, since of a total of 29,600 warrants traded on the date of closing, only 700 (2.3%) were traded at the low market figure of $15⅞.

20. Although Gulf & Western argues that the fact of non-registration does not or should not affect the *cost to it* of the warrants, and that the September 30, 1968 valuation should therefore equal the market value of registered warrants on that date, this argument ignores the value of money as a commodity. Gulf & Western elected not to purchase the Oppenheimer shares in Allis-Chalmers for cash. If it had possessed 496,000 registered warrants on September 30, 1968 it could have used these warrants and relied on their market value as reflected on the American Stock Exchange. It apparently had neither cash nor registered warrants, however, and therefore determined to use unregistered warrants. To Oppenheimer these warrants represented an allocation of capital to a non-liquid, speculative investment which would remain essentially non-liquid until registration on the American Stock Ex-

change. This accounts for the diminution in value to Oppenheimer attributable to the fact of non-registration. *See W. Fletcher, Cyclopedia of the Law of Private Corporations* § 8907, vol. 19, p. 67 (1959 ed.). On the other hand, Gulf & Western realized an immediate return for the non-registered warrants in the form of freely marketable Allis-Chalmers stock without the necessity of waiting the uncertain period required for registration of its warrants. By doing this Gulf & Western was able to shift to Oppenheimer and avoid for itself any tie-up of capital during the period of non-registration. To use an analogy, Gulf & Western was able to obtain immediate payment for an unfinished product coupled with a promise to complete the production process. By doing so it avoided the cost of financing the Oppenheimer purchase during the interim between September 30, 1968 and the date of registration. It cannot be denied that the true cost of producing a marketable warrant is less when one is paid early in the production process rather than after the process is completed. Given an assumed constant market value for the completed product, one who is paid prior to completion need only receive an amount sufficient to produce, through investment, the actual market value of the product as of the date of completion. A discount for non-registration was therefore appropriate. *Cf. Security Options Corp. v. Devilliers Nuclear Corp.*, 472 F.2d 844, 846 (2d Cir. 1972).

stant or increased from September 30, 1968 through the ninety days after effective registration, Oppenheimer, if it retained its warrants, would no longer be protected by the guarantee.

Turning to Gulf & Western, the guarantee has other, more significant features. On its face, it gave Gulf & Western a choice between early registration and possible liability under the $13.50 guarantee provision. More importantly, however, it gave Gulf & Western an opportunity to limit its own costs in the event the $13.50 guarantee was invoked, by giving Gulf & Western a three-day period during which it could *itself* repurchase the warrants at the guarantee price.[21] If it elected to do so, Gulf & Western could have effectively converted its stock acquisition to a cash purchase with the payment of the purchase price delayed for a period of several months after delivery of the Allis-Chalmers stock. If this were to happen, Gulf's "cost" would have been limited to the cost of preparing the unregistered warrants (negligible), plus the cost of registration, plus the purchase price of $13.50 per warrant, minus the market value of the use of the $13.50 per unregistered warrant during the interim between the September 30, 1968 closing and the purchase back of the warrants.

This analysis makes it clear that the guarantee could not have eliminated the disparity between the market value of the registered warrants being traded on the American Stock Exchange and the fair value of the unregistered warrants used in the Oppenheimer transaction, and that far from presenting an additional and costly risk to Gulf & Western, the guarantee actually presented a method to limit the "cost" of the warrants to

well below the volume-weighted market value of $16.1144 for similar registered warrants as reflected on the date of closing.[22] The record in this case clearly supports the $13.69 figure drawn from the opinions of the experts, and we therefore adopt this evaluation as properly reflecting the section 16(b) purchase price of the Allis-Chalmers shares obtained from Oppenheimer. The full purchase price of these shares is therefore $6,790,240.00 ($13.69 × 496,000).

### B

 Turning to the December 6, 1968 sale by Gulf & Western of its entire holding 3,248,000 shares of Allis-Chalmers common stock to White, we must determine the section 16(b) value of the total consideration received from White and the proportional amount of this total consideration attributable to the 248,000 shares obtained from Oppenheimer. The total consideration received from White consisted of $20,000,000 in cash, 250,000 unregistered shares of White common stock, and an unsecured six month promissory note from White in the face amount of $93,680,000 at an interest rate of eight and one-half percent. The district court valued the 250,000 unregistered shares of White stock at seventy-five percent of the volume-weighted average price of identical registered shares being traded on the New York Stock Exchange on December 6, 1968. The White note was valued at ninety-five percent of its face amount. Allis-Chalmers says that the district court erred in both determinations.

Regarding the unregistered White common stock, Allis-Chalmers contends that the twenty-five percent discount, even if proper in amount, should have been applied to the high market price

---

**21.** There is no express limitation on repurchase by a corporation of its own warrants in the corporate law of Delaware. Del.Code Ann. tit. 8, §§ 157, 160.

**22.** Gulf & Western voluntarily extended the guarantee period on March 18, 1969 when Oppenheimer gave notice of its intent to sell its warrants. The extension did not avoid liability

under the guarantee, however, since during the extension Oppenheimer sold pursuant to proper notice. Gulf & Western made payment under the guarantee in the sum of $2,154,437.50 on June 5, 1969. Apparently Gulf & Western believed this the better alternative to simply purchasing the warrants themselves at the $13.50 figure.

for identical registered shares traded on December 6, 1968 rather than to the volume-weighted average price for that day. The high price was $42.50 while the volume-weighted average price was $40.3458.[23] It is urged that use of the higher valuation was required under the rationale of *Bershad v. McDonough*, 428 F.2d 693 (7th Cir. 1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971), and *Smolowe v. Delendo Corp.*, 136 F.2d 231 (2d Cir. 1943), *cert. denied*, 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446 (1943), in order "to squeeze all possible profits" from the transaction. 136 F.2d at 239. While we agree with the underlying principle of the *Bershad and Smolowe* cases,[24] we are unable to agree that use of the volume-weighted average price in this case offended that principle.

*Smolowe* was a case involving the problem of trade-matching. A section 16(b) insider had engaged in numerous purchases and sales within a six month period and the question there was which purchase to match with which sales in order to compute section 16(b) profits. After rejecting the possibility of using an "identity" test or the related "first-in, first-out" rule as being ineffective in the case of a large stockholder who could choose his opportunities to sell specific certificates and avoid section 16(b) liability altogether, and after rejecting the notion of averaging all purchases and all sales within a six month period as effectively allowing a set-off of losses within the period in contravention of the provision in section 16(b) that "any" profit be recovered, the court concluded:

> The statute is broadly remedial. . . . Recovery runs not to the stockholder, but to the corporation. We must suppose that the statute was intended to be thoroughgoing, to squeeze all possible profits out of stock transactions, and thus to establish a standard so high as to prevent any conflict between the selfish interest of a fiduciary officer, director, or stockholder and the faithful performance of his duty. . . . The only rule whereby all possible profits can be surely recovered is that of lowest price in, highest price out—within six months—as applied by the district court. We affirm it here, defendants having failed to suggest another more reasonable rule. 136 F.2d at 239. (footnote omitted).

Nothing in this language suggests that the "lowest price in, highest price out" rule was meant to have application in cases where only one purchase or one sale has taken place so that trade-matching is not a problem, and the last sentence of the passage clearly indicates that even in trade-matching situations the rule is not absolute if a more reasonable method is suggested.[25]

**23.** Curiously, Allis-Chalmers seems to contend at one point in its brief that a discount of 28% rather than 25% should have been employed. Thus, in its table of computations it figures on the basis of $42.50 discounted by 28% times 250,000 shares. The table shows a correct product of $7,650,000 for these figures which is then compared to the district court's figure of $7,613,493 to arrive at an alleged improper diminution in profit of $36,507 as a result of the judge's failure to use the $42.50 rather than the volume-weighted average price. But more significant is the district judge's use of a discount of 25% rather than the 28% shown in the Allis-Chalmers table. Had Allis-Chalmers used the 25% figure in its table, it would have reflected a diminution in "profits realized" resulting from the use of the volume-weighted average price (rather than the high market price) of $355,257 rather than the $36,507 figure. In the conclusion of its brief Allis-

Chalmers in fact does combine the 25% discount with the $42.50 figure to reflect the true impact of the court's use of the volume-weighted average price.

**24.** Plaintiffs also cite *Anderson v. Commissioner*, 480 F.2d 1304, 1307 (7th Cir. 1973), in support of their position, but this tax case adds nothing more than a general citation with approval of the *Bershad* and *Smolowe* cases.

**25.** Plaintiffs contend that *Newmark v. RKO General, Inc.*, 305 F.Supp. 310, 314 (S.D.N.Y. 1969), *aff'd*, 425 F.2d 348 (2d Cir. 1970), *cert. denied*, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970), represents an application of the "general rule" in a non-trade matching situation. While it is true that the rule of "highest in" was there used, it is also clear that the "highest in" valuation was not objected to on appeal, 425 F.2d at 357, and extensive analysis of the use of this figure was never urged.

*Bershad* did not involve valuation at all, but revolved around the question of whether the granting of a certain "option" to purchase stock amounted to a sale of that stock for section 16(b) purposes. In determining that it did, this court noted the broad purpose of the section:

> Section 16(b) was designed to prevent speculation in corporate securities by "insiders" such as directors, officers and large stockholders. Congress intended the statute to curb manipulative and unethical practices which result from the misuse of important corporate information for the personal aggrandizement or unfair profit of the insider. Congress hoped to insure the strict observance of the insider's fiduciary duties to outside shareholders and the corporation by removing the profit from short-swing dealings in corporate securities. Conversely, Congress sought to avoid unduly discouraging bona fide long-term contributions to corporate capital. . . .
>
> In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration. The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation. This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof. Such arbitrary and sleeping coverage was deemed necessary to insure the optimum prophylactic effect. 428 F.2d at 696.

Though the court cited *Smolowe* in support of these statements, it cannot be argued that this general statement of purpose somehow enshrined in the law of this circuit a flat rule of lowest price in, highest price out for all valuation problems under section 16(b). Valuation simply was not in issue in *Bershad.*

In this case, authenticated copies of the Fitch Report for December 6, 1968 trading in White common stock on the New York Stock Exchange disclosed that of a market volume of 31,300 shares traded for the day, only four hundred shares were traded at the market high price of $42.50. This represents a scant 1.277 percent of the market in White shares. By far the largest single sale on December 6, 1968, a trade of 7600 shares, reflected a price of $40.00—significantly less than the volume-weighted average price of $40.3458. In addition, Allis-Chalmers' own expert testified that normal accounting procedure was "to figure . . . in terms of the average of the high and low price in a given day rather than one end or the other," and that he had made his discount computations from the high market figure in this instance only at the instruction of counsel for Allis-Chalmers.

We have held that the goal of squeezing out all profits "does not require a court to adopt a completely unrealistic interpretation of the market." *Mueller v. Korholz,* 449 F.2d 82, 87 (7th Cir. 1971), *cert. denied,* 405 U.S. 922, 92 S.Ct. 959, 30 L.Ed.2d 793 (1972). We find no error in the determination of the district court that it would be unreasonable and unrealistic here to attribute a market value of $42.50 per share to a block of 250,000 shares of White common stock acquired on December 6, 1968. On the basis of the Fitch Report alone it would be difficult to reach a different conclusion. Section 16(b), while it was intended to be thoroughgoing, was surely not intended to reject accuracy in favor of punitiveness.

Looking finally to the district court's valuation of the unsecured White note, we must determine whether the discount of five percent of the face amount of the note was properly applied. This discount was intended to account for the risk factors involved in a note of this size and to produce a value reflecting what "the disinterested but available third party investor" would pay for the note on December 6, 1968. In adopting the ninety-five percent valuation figure the court rejected undisputed evidence that the note was in fact paid in full with inter-

est by White three and one-half months after closing. The question therefore becomes whether the difference between the market value of the note and the actual value the note produced for Gulf & Western falls within the statutory phrase "any profit realized." We have no hesitation in holding that it does.

As we have previously noted, section 16(b) was designed to curb misuse of inside information by removing profit from a class of transactions deemed by Congress to present an intolerable invitation for such abuse. *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 422, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972). All transactions within the class are tainted with a presumption that inside information has been misused, and the presumption precludes any defense based on the showing of a "clean heart" by the section 16(b) defendant. *Id.,* at 424 n. 4, 92 S.Ct. 596; *Newmark v. RKO General, Inc.,* 425 F.2d 348, 353 (2d Cir. 1970), *cert. denied,* 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970). It should be noted, however, that the statute does no more than remove the profit from such transactions. It does not inflict an affirmative fine or penalty. Thus, one who is forced by personal circumstances into a section 16(b) transaction does not face financial ruination, but merely the prospect that his short-term investment of capital has not produced a positive gain.

Given the broad remedial purpose of section 16(b), its limited impact, and the intent of Congress in drafting this section to "eradicate speculative abuses by reducing difficulties in proof," *Bershad v. McDonough,* 428 F.2d at 696, we hold that in transactions involving debt obligations of an amount certain, evidence of payment in full, if available at the time of trial, should control the determination of "profit realized." [26] We cannot help but wonder whether Gulf & West-

ern's present belief that estimated market value at the time of closing is the only proper measure of 16(b) liability could have withstood the strains of a situation where White had in fact defaulted on the note completely. In any event, a rule of evaluation which looks to the realities in such situations will avoid the possibility that real profits will escape the reach of the statute or that non-existent profits will be "recovered." We believe this to be no more nor less than the language of the section requires.

IV

■ To summarize, the consideration received from White Industries is properly evaluated as follows: $20,000,000 in cash, plus $7,564,837.50 in unregistered White common stock (250,000 × $40.3458 × .75 discount factor), plus $93,680,000 in the form of the White promissory note, for a total consideration of $121,244,837.50. This figure must be prorated to reflect the portion attributable to the Oppenheimer purchase. A simple method of doing this is to divide the total consideration by the total number of shares sold ($121,244,837.50 ÷ 3,248,000 = $37.3291) and then multiply the resulting per-share figure by 248,000. Using this method a proportional consideration for the 248,000 shares of $9,257,616.80 is produced. Subtracting the acquisition price of $6,790,240.00 from this figure yields a gross profit allocable to the Oppenheimer transaction of $2,467,376.80. From this figure must be deducted the stipulated expenses incurred by Gulf in connection with the Oppenheimer purchase in the amount $1,696.33. The resulting net profit for section 16(b) purposes is $2,465,680.47.

The judgment of the district court is therefore reversed in part and remanded for entry of judgment in favor of Allis-Chalmers in the amount of $2,465,680.47. Each party is to bear its own costs.

---

26. The evidence showed that the prime rate of interest at the time of this transaction was 6½%. Expert testimony indicated that the nature of the note and the circumstances surrounding the sale to White justified the higher 8½% rate agreed to by the parties. There has been no contention that the increment over the prime rate was used to conceal 16(b) profits by artificially reducing the face amount of the note.